[No. 50472. Second Dist., Div. Three. Aug. 8, 1985.]

DORIS DAY et al., Cross-complainants and Respondents, v. JEROME B. ROSENTHAL et al., Cross-defendants and Appellants.

[And 12 other related cases.]

COUNSEL

Gerald Goldfarb, James S. Tyre, Paul P. Selvin and Selvin & Weiner for Cross-defendants and Appellants.

Irell & Manella, Robert L. Winslow, Peter J. Gregora and Hydee R. Feldstein for Cross-complainants and Respondents.

## OPINION

**GOLDIN, J.**[*]—This is an appeal from judgment entered on March 31, 1975, in 13 consolidated cases. Judgment was in favor of Doris Day Melcher, the estate of her late husband Martin Melcher, her son Terrence Melcher and various of their family corporations (collectively the Melchers) and against Jerome B. Rosenthal (the Melchers' former attorney), Harland Green (Rosenthal's law partner) and various law firms and business entities with which Rosenthal had been affiliated (collectively Rosenthal). The judgment held Rosenthal liable to the Melchers for legal malpractice, breach of fiduciary duty, fraud and abuse of process, and awarded them $26,396,511 including $1 million in punitive damages. Green was held vicariously liable for compensatory damages only.[1]

The trial court also entered judgment against Rosenthal with respect to his affirmative claims against the Melchers on grounds, among others, that the purported contracts he relied upon never existed, were invalid or unenforceable because they had been procured by undue influence, or had been breached by Rosenthal. The trial court also awarded injunctive relief requiring Rosenthal to turn over trust funds and records belonging to the Melchers.

Rosenthal appeals from the judgment.[2]

### PROCEDURAL BACKGROUND

This appeal is the outgrowth of an 18-year relationship between the Melchers and Rosenthal.[3] The principal characters in the drama which has become the central theme of one of the longest continuous engagements in California civil litigation are Doris Day Melcher (sometimes Doris Day,

---

[*]Assigned by the Chairperson of the Judicial Council.

[1]The trial court expressly found that Green did not personally commit *any* wilful, intentional, fraudulent, criminal, malicious or oppressive act, and therefore Green is not liable in damages or otherwise, to Day or to the Melcher parties or any of them, on account thereof.

[2]Green also appeals. His position is that insofar as he is concerned the money judgment has been compromised and satisfied. His appeal has not been dismissed because he was found vicariously liable and because the disposition of the money portion of the damages was expressly made without effect upon the other portions of the judgment or findings. Green says simply that "no matter the disposition of the appeal insofar as any other party is concerned, the findings, conclusions, and judgment with respect to [him] should not be disturbed. . . ."

[3]The reporter's transcript in this case exceeds 15,000 pages, and the clerk's transcript is almost 12,000 pages long. There are more than 2,000 numbered exhibits which are so voluminous that when placed in neatly stacked boxes they occupy a space approximately 6 feet long by 6 feet wide by 4 feet high.

sometimes just plain Day), at all times a singer, entertainer and actress; Martin Melcher (Melcher) at one time Day's agent and commencing in 1951, and ending with his death in 1968, her husband and surrogate in all her business and financial affairs; and Jerome B. Rosenthal, "Hollywood" attorney, the person without whose guidance Melcher would not make a move, from 1952 sole attorney for the Melchers and from 1956 until his termination by the Melchers in 1968, their attorney, accountant, business manager, investment advisor and recordkeeper.

When Rosenthal's role was cut out of the Melcher production, he filed a lawsuit alleging breach of his 1956 retainer agreements with the Melchers. After they responded, he filed a host of others, in essence claiming the Melchers had breached various contracts with him. The Melchers answered, cross-complained and filed affirmative actions for breach of fiduciary duty, legal malpractice, fraud and abuse of process.[4]

The stage was set for the action which followed albeit most of it occurred more than five years later.[5]

A nonjury trial[6] commenced on March 4, 1974, and continued uninterrupted until August 30, 1974.

In its oral statement of intended decision the trial court summarized its basis for entering judgment for the Melchers and against Rosenthal in each of the consolidated cases:

"The tragic drama in this case started to unfold back in the late '40's or early '50's when Jerome B. Rosenthal began to represent Doris Day and Martin Melcher.

"It involves . . . . [¶] an attorney so intent on doing business with his clients, with their money . . . that he lost sight of ethical and legal principles.

". . . . . . . . . . . . . . . . . . . . . . . . . . .

"The case from beginning to end oozes with attorney-client conflicts of

---

[4]In all, at one point in the saga, there were pending eighteen lawsuits in five jurisdictions. At the time of trial, 13 California actions had been consolidated.

[5]There was the usual (and unusual) deluge of demurrers, motions, answers and related proceedings, none of which are relevant here. Certain proceedings and orders involving discovery are issues before this court and will be detailed later.

[6]Rosenthal asserts that he was erroneously denied a jury trial. The facts relevant to this issue will be detailed later.

interest, clouding and shading every transaction and depriving Doris Day and Martin Melcher of the independent legal advice to which they were entitled. It involves kickbacks, favored treatment of one client over others; it involves amateurish attempts to deal in the hotel and oil business that would be humorous but for the tragic consequences. It involves the extraction of fees from Doris Day and Martin Melcher and fees from other clients or entities for the same work performed. It involves an undertaking to provide financial and investment advice and a complete and utter failure to provide it. It involves a tortured effort by Rosenthal to maintain for years in the future the indentured position in which he had held Doris Day since 1956, even after she had ceased to permit him to act as her attorney. It involves a percentage retainer agreement that in the context of the facts of this case is void and against public policy because of the violation of the rules of professional conduct. . . .

"The evidence so reeks of negligence, a violation of the Rules of Professional Conduct and all that is basic in the traditional relationship of attorney and client as to require that the court, as best it can, undo the transaction that occurred so as to attempt to put Doris Day and her late husband's estate back to a position as if they had not become enmeshed in the machinations of Rosenthal's twisted sense of professional responsibility."

## FACTUAL BACKGROUND

A brief summary of the more significant facts will put Rosenthal's arguments on appeal into perspective.[7]

Rosenthal was at all times throughout his relationship with the Melchers, a lawyer, licensed to practice in the State of California. The Melchers were successful in the make believe world of show business, but were uneducated and unsophisticated in the real world of finance. Day relied totally on Melcher to handle her business and financial affairs, and Melcher relied totally on Rosenthal to handle all the Melchers' business and financial affairs. According to Day, "[Melcher] was so impressed . . . with Mr. Rosenthal that anything Rosenthal said to him was law and had to be right. He was in awe of the man." Rosenthal didn't disagree, "they entirely relied upon and followed [my] recommendations. . . . [T]hey did nothing on their own . . . nor did they ever go against the advice. . . . [They] did nothing independent or on their own."

---

[7]The record is so massive that, of necessity, the factual background will only highlight the evidence and, for the sake of brevity, will in some instances rely on the court's findings. Rosenthal disputes some of the findings. His contentions are discussed *post*.

On May 11, 1956, the Melchers and Rosenthal signed written retainer agreements (the 1956 retainer agreements). These "simple" agreements gave Rosenthal a 10 percent interest in virtually everything the Melchers owned and earned. It obligated him to manage and give advice, but to litigate only for a separate, to-be-negotiated fee. Rosenthal had already represented the Melchers as an attorney for several years prior to May 11, 1956, and had an obligation to provide a full disclosure of the true implications of the agreements. He never adequately informed them, and he didn't advise them to obtain independent legal advice. They signed the agreements in all innocence and as a result of undue influence.

For many years prior to his death, Melcher maintained an office adjacent to Rosenthal's. There were times during which he and Rosenthal had meetings, conferences, and conversations on a daily basis. By virtue of the attorney-client relationship, Rosenthal's status as an attorney, and his claim to business acumen, Melcher was awed and developed a false sense of security concerning his ability to rely and depend on the advice rendered by Rosenthal regarding Melcher's legal and business affairs. The 1956 retainer agreements converted Rosenthal from mere attorney into business advisor and tax planner. They gave him the contractual basis for ascendancy over the Melchers' financial affairs.

Rosenthal took to his role as the Melchers' business advisor with gusto. He created Phoenix Enterprises, Inc. (Phoenix), a Rosenthal dominated corporation, to package and promote oil and gas ventures, contract drilling operations and lease equipment, and Doanbuy Lease & Company, Inc. (Doanbuy), a Rosenthal alter ego, to operate oil wells. Between 1956 and 1962, Rosenthal involved the Melchers in various Phoenix-promoted oil and gas ventures which were, uniformly, financial disasters for the Melchers and profitable for Rosenthal.[8] From 1956 to 1968, the Melchers lost in excess of $4 million thanks to investments in Rosenthal's oil and gas promotions. From 1956 to 1968, Rosenthal gained secret profits of more than $400,000 thanks to his creatures Phoenix and Doanbuy.

In 1962, Melcher agreed to form an oil and gas exploration partnership with a promoter named Atkins. Two years later, when Rosenthal finally drafted the written agreements, it was a tripartite partnership, which included him. Melcher put up the money, an initial cash contribution of $328,000; Rosenthal and Atkins each put up a note, a promise to pay $110,000. The leases were for the exploration of unproven territory.

---

[8] In order to avoid repetition, significant details of these and other misadventures which have a bearing upon specific issues will be detailed in connection with a discussion of those issues.

The partnership was in constant need of money. In the five years that followed, Melcher contributed an additional $740,000; his "equal" partner Rosenthal contributed under $74,000 (much of it borrowed from Melcher). Rosenthal's business management also cost the Melchers $230,000 in "legal fees," "overhead expenses" and "profit distributions" from the partnership to Rosenthal. The trial court found that Rosenthal's conduct with respect to the Melcher-Atkins-Oil partnerships was a breach of fiduciary and contractual duties owed to Melcher, and involved "repeated conflicts of interest" on Rosenthal's part.

During 1966, Rosenthal set in motion false transactions involving oil drillers through which, ultimately, he acquired $45,000 from Melcher and others. The trial court found the "transactions were designed by Rosenthal . . . with a fraudulent intent. . . . [a]nd resulted in a misappropriation, misapplication and misuse by Rosenthal" of the money.

Rosenthal, the Melchers' tax advisor, misguided them into a 15-year tax morass.

In 1953, Rosenthal advised the Melchers to invest in a "tax shelter" promoted by his client, Bernard Cantor. The scheme involved the purchase of Federal Land Bank bonds at slightly less than their face value, through Cantor's company, Cantor-Fitzgerald Company (Cantor-Fitzgerald). The bonds were to be financed entirely by a loan from Gibraltar Financial Corporation, an under capitalized shell corporation controlled by Cantor-Fitzgerald. The investor would execute a note for the principal sum of the bonds to Gibraltar, bearing a higher interest than the underlying bonds. The note would be secured by the bonds. The investor would pay interest to Gibraltar and repay the principal by sale of the bonds immediately before maturity. The scheme was supposed to generate substantial tax benefits.

Rosenthal induced the Melchers to purchase bonds with a face value of $3 million. The anticipated out-of-pocket cost to the Melchers was $115,000 (the difference between the interest on the bonds and the interest payments on the note). The scheme would have utility to the Melchers only if it generated more than $115,000 in tax savings.

Rosenthal had two conflicts from the inception of the scheme. First, Cantor-Fitzgerald was his client. The Melchers were not informed of this detail. Second, Cantor-Fitzgerald was secretly compensating Rosenthal for securing investors. Rosenthal, who also invested in the bond deal, got better terms than the Melchers. And, while the Melchers, and other Rosenthal clients, such as singer-entertainer Gordon MacRae, were paying to Gibral-

tar, Rosenthal was collecting from Cantor-Fitzgerald. Of course, the Melchers were not informed of these facts, either.

Without belaboring the scheme any further, suffice it to say that it was a sham. Gibraltar had no money to loan and didn't lend the Melchers $3 million. The bonds were never held as security. Any competent tax attorney would have investigated and advised against the transaction. Not Rosenthal; he had too great a personal stake in the gains he obtained from his conflicting relationships with Cantor-Fitzgerald.

In 1958, the IRS issued a deficiency notice against the Melchers (and against MacRae) disallowing interest deductions on account of the bond transaction. Rosenthal represented the Melchers in the United States Tax Court in the protracted litigation which followed. In 1961 MacRae's efforts to obtain a tax deduction arising out of a virtually identical bond transaction was unsuccessful in the United States Court of Appeal Ninth Circuit. Rosenthal still did not advise the Melchers to cut their losses. Any competent tax attorney would have. In 1966, when the IRS offered to settle with the Melchers by disallowing the interest deduction, but allowing a capital theft loss in the sum of $115,000, Rosenthal didn't even communicate the offer to his clients. He was too interested in keeping the Melchers' money coming his way to permit its diversion to pay the IRS.

The Melchers' 1967 loss in the tax court was both predictable and substantial. They were required to pay taxes and interest in the sum of $400,000. Through Rosenthal's negligent and conflict ridden tax guidance in the Federal Land Bank bond transactions, the Melchers lost $400,000 to the IRS and the $115,000 out-of-pocket they had already paid Cantor-Fitzgerald and Gibraltar.

Commencing in 1959, Rosenthal managed the Melchers into a couple of disastrous hotel deals. As with other Rosenthal directed "investment" programs, the Melchers invested and Rosenthal divested. The trial court said, "her [Day's] money went into the hotels, the hotel money went into his pocket. I mean, it is just that simple." Rosenthal never documented the Melchers' ownership in the hotels, predictably causing chaos, confusion and litigation. Rosenthal inveigled his way into an ownership interest in the hotels (with Melcher's money). He directed the mismanagement of the hotels through another of his alter egos, Cabana Management, Inc.

Under his aegis, the hotels failed. The Melchers had no idea until after Melcher's death: Rosenthal lured them into continuing the flow of cash by telling them the hotels would soon be profitable and were much more valuable than was the fact. When Melcher died and the stream of Melcher

money dried up, the hotels collapsed. One was adjudicated bankrupt, the other was sold to pay creditors. The Melchers' over $3 million "investment" was lost. The trial court found that Rosenthal had had conflicts of interest and breached his fiduciary and contractual duties to the Melchers in virtually every aspect of the hotel ventures. His misfeasance was the cause of the Melchers' losses.

Pursuant to the 1956 retainer agreements, Rosenthal was supposed to furnish the Melchers with "regular statements of receipts and disbursements . . . and periodic profit and loss statements." The trial court found that he didn't. "The . . . financial material that was provided to [them] by Rosenthal was inaccurate and misleading. Oil and gas properties and hotels . . . were materially over-valued." And, when Melcher had Price, Waterhouse & Company do an independent study and report which indicated that the value of the Melchers' oil and gas holdings had been overstated in reports prepared by him, "Rosenthal . . . convinced Melcher that the advice of Price, Waterhouse & Company was improper and inaccurate." The trial court found that Rosenthal had breached his fiduciary and contractual obligations to the Melchers in the matter of financial statements and accountings.

The trial court found that "[a] substantial portion of the funds which were paid by [Melchers] in connection with business ventures and investments recommended by Rosenthal were deposited into [Rosenthal's] trust account. . . . Similarly, gross receipts, royalties and other payments generated from these business ventures and investments should also have been deposited into this account." But from Rosenthal's records it was impossible to tell whether all such deposits had been made. He "developed an unorthodox and complicated accounting system for clients' funds deposited into this trust account. . . . [F]unds attributable to several separate [Rosenthal] clients . . . were commingled under a single ledger. Further, funds ostensibly deposited on behalf of [Rosenthal] in an investment venture were commingled with the funds of the [Melchers'] and other clients participating in this same venture."

The Melchers never received an accounting of their trust funds and it appeared "that funds belonging to [the Melchers] had either been distributed to . . . other [Rosenthal] clients or had been used to satisfy the obligations of these other clients." The trial court found that $2.2 million plus, of the Melchers' funds deposited in Rosenthal's trust account could not be accounted for, in violation of Rosenthal's fiduciary and contractual duties to the Melchers. Furthermore, it was revealed for the first time during the trial that something over $30,000 of the Melchers' money was in Rosenthal's trust account. The trial court found Rosenthal had "wrongfully and delib-

erately withheld" this money from the Melchers during the six years preceding the trial.

Rosenthal was not above secretly pitting Melcher against Day for his own benefit. He had overwhelming influence on Melcher, not on Day. But Day had the money, not Melcher. The solution: A Day-Melcher agreement that gave Melcher 25 percent of Day's gross income for acting as her personal manager. With that, Melcher had money, but not enough money to feed the cost-consuming hotels and Melcher-Atkins Oil. Rosenthal's new solution: He convinced Melcher to use Day's money without her knowledge or consent. The method was simple. The trial court found that Melcher and Rosenthal (signatories on Day's bank accounts) would withdraw funds documented as being "for the purpose of making a loan to Arwin [Arwin Productions, Inc., one of the Melchers' family corporations] or one of the other Day-Melcher entities." The family corporation would then "loan" the funds to Melcher or directly to the needy venture. Rosenthal saw to it that, where needed, Melcher would sign Day's name to corporate resolutions authorizing the loans. According to the findings, the "triangle loans" were devised by Rosenthal as a means of surreptitiously piping money from Day to Melcher to Rosenthal. Rosenthal never informed Day of this convenient conduit. Rosenthal's advice that his client Melcher act, without informing his client Day, cost Day almost $3 million.

From 1953 until he was dismissed by the Melchers in 1968, Rosenthal was being paid for his services. He received fees in excess of $2.5 million directly from the Melchers, exclusive of all the other money he acquired without their knowledge.

After Melcher's death, Rosenthal's true antagonism toward his clients came to the fore. He tried to maintain control of the Melchers' money through Terrence Melcher whose appointment as administrator of Melcher's estate he arranged. When Terrence wouldn't blindly follow Rosenthal's lead, and when Terrence and Day had the temerity to fire Rosenthal, he instituted proceedings to have Terrence removed as administrator. He also instituted 18 legal proceedings against his former clients, "misusing confidential information acquired in the course of the attorney-client relationship to the detriment of his former clients." At the same time he wrongfully retained from the Melchers files and records containing vital information directly relating to the litigation.

Rosenthal abandoned all of the assets of the Melcher-Atkins Oil partnerships, without making any effort to salvage so much as one shard of the wreckage he had engineered. He repeatedly blocked efforts in the bankruptcy court to save something from the hotel disasters. The court found he

did so "for the ulterior purpose" of retaining "control of the hotel's operations . . . thereby permitting [him] to continue to collect substantial sums of money from the hotel." He also abused the judicial process in the bankruptcy court by "filing false claims . . . fraudulently increasing the amount of his claims . . . filing sham proposals . . . filing meritless Petitions for Review . . . initiating collateral attacks in other federal courts; and pursuing appellate review with bad faith and without probable cause. . . ." Rosenthal's machinations assured that Day would suffer an unnecessary one-half million dollar loss in the hotel bankruptcy proceedings. The trial court found that Rosenthal's conduct amounted to an "abuse of process and malicious prosecution."

Terrence Melcher, as special administrator of Melcher's estate, and his attorneys and accountants, attempted to obtain from Rosenthal information and business records of the estate. Rosenthal resisted, almost without exception refusing to turn over the requested files and records belonging to the Melchers. The documents were so numerous, he claimed, " 'that it might take several years to transfer all of these files.' " Documents were transmitted, sporadically, until the Melchers sought and obtained the appointment of a receiver. Rosenthal still resisted. Sheriff's deputies had to be called to his office to assist the receiver to take possession of the files and records. He refused to unlock the file room and the receiver was required to call a locksmith to provide access to the Melchers' files and records.

The trial court found, "the files taken into the possession of the Receiver contained material information that had been withheld by Rosenthal and established that the records which he did turn over . . . were deceptive, calculated to mislead and delay. . . . As a final audacity, Rosenthal presented a substantial volume of . . . missing information during his own deposition in January 1974 (less than two months before the commencement of this trial). . . ."

The trial court drew the conclusion from "Rosenthal's demeanor and testimony during the trial . . . that he considered his course of conduct appropriate gamesmanship and that he has never been concerned about the continuing fiduciary obligations owed to his former clients. . . ."

### DISCUSSION

Rosenthal urges numerous errors, some of them applicable to his affirmative role as plaintiff in the consolidated cases (Rosenthal *qua* plaintiff is the term he uses and this court adopts) and others bearing on Rosenthal solely *qua* defendant. The final judgment in favor of the Melchers, the one

from which Rosenthal appeals *qua* defendant, was, in the main, a money judgment.[9] Rosenthal's malpractice insurers settled all monetary awards with the Melchers. In this appeal Rosenthal does not seek a reversal which would undo the financial aspects of the settlement. (See *Rosenthal v. Irell & Manella* (1982) 135 Cal.App.3d 121 [185 Cal.Rptr. 92].) He wants "vindication," relief from the "stigmata heaped upon him."

It is not clear that this court must take cognizance of Rosenthal's arguments which would not undo the judgment. (Cf. *Crangle v. City Council of Crescent City* (1933) 219 Cal. 239, 241-242 [26 P.2d 24]; *General Petroleum Corp.* v. *Beilby* (1931) 213 Cal. 601, 604 [2 P.2d 797]; *Leroy* v. *Bella Vista Investment Co.* (1963) 222 Cal.App.2d 369 [35 Cal.Rptr. 128]; but see *In re Dana J.* (1972) 26 Cal.App.3d 768, 771 [103 Cal.Rptr. 21].) Regardless, the issues raised by Rosenthal *qua* defendant are intertwined with those argued by him *qua* plaintiff, and illuminate issues which this court must reach. Therefore, all pertinent questions, whether they affect Rosenthal *qua* plaintiff or defendant, will be discussed.

Because the material which must be covered is so massive, it is organized as follows:

1. Sufficiency of the evidence.

2. Credibility.

3. Fraud.

4. Findings.

5. Pretrial issues.

1. *Sufficiency of the Evidence*

 a. *Rosenthal's Malpractice*

Rosenthal's thesis is not that there is a dearth of evidence of his wrongdoing, but that his negligence was not proven through expert testimony.[10] He cites the right law for the wrong facts.

---

[9]In addition to money, the judgment also forever enjoined Rosenthal from conducting any litigation against the Melchers in any way, based upon any facts, occurrences or claims arising prior to August 30, 1973, and granted other equitable relief to the Melchers against Rosenthal *qua* defendant. Rosenthal does not seek specific relief in those areas. He says "The language of the judgment below is money," and simply prays that the judgment be reversed "in whole or in part."

[10]Rosenthal seeks a reversal in case Nos. 938682; 947515 and 948124 because of this purported failure of the evidence. All three cases involve the 1956 retainer agreements, which the trial court invalidated because of Rosenthal's negligence *and* because they were the product of Rosenthal's undue influence and were repeatedly and continuously breached by Rosenthal. Many of the examples of Rosenthal's malpractice are equally illustrative of his breaches of his fiduciary duties and specific contractual breaches.

■ An attorney is required to perform any service for which he has been hired with "such skill, prudence, and diligence as lawyers of ordinary skill and capacity commonly possess and exercise in the performance of the tasks which they undertake." (*Lucas* v. *Hamm* (1961) 56 Cal.2d 583, 591 [15 Cal.Rptr. 821, 364 P.2d 685]; *Neel* v. *Magana, Olney, Levy, Cathcart & Gelfand* (1971) 6 Cal.3d 176, 180 [98 Cal.Rptr. 837, 491 P.2d 421], *Ishmael* v. *Millington* (1966) 241 Cal.App.2d 520, 523 [50 Cal.Rptr. 592].)

■ Furthermore, "it is an attorney's duty to '*protect his client in every possible way,*' and it is a violation of that duty for the attorney to 'assume a position adverse or antagonistic to his client without the latter's free and intelligent consent given after full knowledge of all the facts and circumstances.' The attorney is 'precluded from assuming any relation which would prevent him from devoting his *entire* energies to his client's interest.' [Citations omitted]." (*Betts* v. *Allstate Ins. Co.* (1984) 154 Cal.App.3d 688, 715-716 [201 Cal.Rptr. 528].) (Italics added.) An attorney's failure to perform in accordance with his duty is negligence. (*Smith* v. *Lewis* (1975) 13 Cal.3d 349, 355, fn. 3 [118 Cal.Rptr. 621, 530 P.2d 589, 78 A.L.R.3d 231].) From the time when he became the Melcher's attorney, Rosenthal was obligated to abide by these high standards of professional responsibility.

The record is so replete with evidence that Rosenthal breached his obligations as an attorney that it is difficult to know which examples to choose. The 1956 retainer agreements are a good starting place. They created the foundation for Rosenthal's abuses, overreaching and doubledealing. They made Rosenthal the Melchers' accountant, investment advisor, recordkeeper and attorney. He became a quadruple threat, in complete control of the Melchers' financial affairs, free of any checks or balances.

The agreements doubled Rosenthal's percentage of the Melchers' income, from 5 percent to 10 percent. Litigation and services in connection with the production of the motion pictures and radio and television shows were not included in the basic compensation. And, Rosenthal's 10 percent was not calculated only on the Melchers' earned income, nor even on income derived as a consequence of Rosenthal's services. His percentage was calculated on all that the Melchers derived from their property, profits from the sale of property, and income of corporations in which the Melchers owned a substantial interest. Many of Rosenthal's financial advantages were to continue long after he had ceased to render any services.

The agreements were short and deceptively simple. They did not spell out any of the ways in which Rosenthal would gain and the Melchers could lose. Yet, as the trial court found, Rosenthal never adequately informed the Melchers of the terms, conditions and implications of their respective 1956 retainer agreements.

The 1956 retainer agreements officially cast Rosenthal as the Melchers' financial guru. He played the role in his own, inimitable style. From 1956 to 1962, he induced the Melchers to invest in various oil drilling ventures. To promote the ventures, Rosenthal created Phoenix, in which he was the controlling stockholder. Phoenix packaged the drilling ventures which Rosenthal promoted to his clients. As an inducement to some of his more sophisticated clients, Rosenthal offered special concessions which limited their obligations to make future payments. The Melchers were not among the chosen few. Rosenthal neither disclosed nor offered concessions to them. And, the Phoenix venture was just one of a number of instances in which Rosenthal favored other clients or investors over the Melchers. Invariably, it was the Melchers who suffered economically, to the tune of hundreds of thousands of dollars.

Through Phoenix, Rosenthal obtained substantial undisclosed profits from the Melchers. Phoenix was the drilling contractor for its oil drilling ventures. Phoenix, however, did not actually do any drilling. It profited by subcontracting the work to drillers, for a *lower* price than it charged Rosenthal's clients. It also gained by leasing equipment to the drilling ventures. Meanwhile, its investors, the Melchers and others, were paying in, not taking out. Over a period of six years, out of the profits Phoenix generated at the expense of the Melchers and others, Phoenix paid undisclosed profits of more than a quarter of a million dollars to Rosenthal as "legal fees," "accounting fees" or "overhead expenses."

Eventually, Rosenthal created an alter ego corporation, Doanbuy, to actually operate the wells. Not only did Doanbuy's management cause expenses to exceed revenues for every year and every well, it also managed to generate substantial fees for Rosenthal. Doanbuy obtained sufficient fees from the Melchers and other Rosenthal clients to realize an undisclosed net operating profit. During the same period—1963 to 1967—Doanbuy paid almost $200,000 to the Rosenthal firm as "legal fees," "accounting fees" and "overhead expenses." Again, Rosenthal acquired money in the form of substantial fees and expenses, without the knowledge or consent of the Melchers.

In still another oil well deal, Melcher agreed to form a partnership with an oil promoter named Tom Atkins to conduct oil and gas exploration. Rosenthal was asked to prepare written documentation for the partnership, which he did not get around to for more than two years. When finally drafted, the written agreements were not an Atkins-Melcher partnership; they included a new partner—Rosenthal (the Melcher-Atkins Oil partnership often identified as MOA). The agreements created a limited partnership with Atkins as a one-third general partner and Melcher and Rosenthal equal one-

third limited partners. Over the years, the partnership was frequently in need of money. Melcher, undeterred by his investment advisor Rosenthal (and probably encouraged by Rosenthal, his partner) pumped more than a million dollars into it.

On Rosenthal's advice, Melcher, the limited partner, executed various personal guarantees of the partnership obligations. Rosenthal too executed some personal guarantees. But, liability for business debts was not his forte. He claimed there was an oral agreement that his clients, the Melchers, would pay all the amounts owed with respect to all guaranteed obligations. According to Rosenthal, the arrangement he had made with his own clients was that they could lose, but not he!

Rosenthal was not performing his valuable MOA services free of charge. While Melcher was paying into the company, Rosenthal was withdrawing "legal fees," "overhead expenses" and "profit distributions." The legal fees were for services which Rosenthal was already obligated to render to Melcher under his 1956 retainer agreement. The distribution of profits to Rosenthal was contrary to the MOA agreement, which provided for a distribution of profits *only* after Melcher's capital investment had been paid back (without interest, of course).

Rosenthal's modus operandi was no different with respect to the hotel investments into which Rosenthal lured the Melchers. Briefly, the evidence is that while acting as attorney for a couple of hotel promoters, Rosenthal induced Melcher to contribute the Melchers' funds to the construction of a hotel, the Palo Alto Cabana, for an undefined equity interest in the hotel. He then induced the Melchers to make a similar advance of funds for the construction of the Dallas Cabana hotel. It goes without saying that Rosenthal did not disclose his relationship with the promoters to the Melchers. Nor did he disclose to them that the promoters, who were making no capital contribution whatsoever, were getting an interest approximately equal to the Melchers, who were making a substantial contribution. Neither did Rosenthal bother to advise the Melchers that he intended to acquire an ownership interest in the hotels without contributing any capital and without contributing any services but those for which he was already being compensated by the Melchers.

Rosenthal's doubledealing continued, with the creation of another alto ego corporation, Cabana Management, Inc. He used the management company to obtain for himself "overhead expenses" and "legal fees," all dutifully and unwittingly provided out of the Melchers' deep pocket, as additional "investments" into the hotels. Ultimately, Rosenthal managed to acquire

one-half of the Melchers' interest in the hotels, without the payment of any money.

The hotel "investments" did nothing but drain the Melchers resources. Rosenthal didn't care; he was getting "paid." And, it was Melcher, not Rosenthal, who personally guaranteed the hotel obligations. While Rosenthal gained, the Melchers lost—more than $3 million on the hotels.

Finally,[11] there was Rosenthal's kickback scheme.

In 1966, Rosenthal formed two limited partnerships, Kencal Oil Company, Ltd., (Kencal) and Marlo Oil Company, Ltd., (Marlo) for the purpose of allowing other Rosenthal clients to participate in oil ventures with MOA as the general partner. Rosenthal then induced the Kencal and Marlo partners as well as Melcher, to invest a total of $198,000 to conduct drilling operations estimated at $125,000.

A brazen plot then unfolded. Rosenthal first asked several independent drilling contractors to prepare false invoices of $198,000. Checks payable to the contractors in the amount of the false invoices were then drawn. In turn, the contractors were induced to cash the checks and return the difference between the face amount of the checks and the actual drilling costs to Rosenthal.

Rosenthal routed the difference (approximately $45,000) through his trust account from which it was immediately withdrawn and deposited in the general account of his law firm. The money was accounted for as "legal fees" received from the contractors. Rosenthal made no disclosure to the Melchers of any fee paid to him by the contractors. The reason was clear: he had performed no legal services which would justify the fees. The Rosenthal-prepared tax returns for 1966 reflected the $45,000 as an "intangible drilling expense," exposing all partners to an unreasonable risk of liability for tax fraud.

It required no expert to tell the trial court that Rosenthal's perverted sense of duty to his clients, the Melchers, is attorney negligence. ▆▆▆ Expert testimony is needed when it will assist the trier of fact. It is not appropriate in all cases. (*Betts* v. *Allstate Ins. Co., supra,* 154 Cal.App.3d 688, 716.) Where the attorney's performance is so clearly contrary to established standards that a trier of fact may find professional negligence without expert testimony, it is not required. (*Wilkinson* v. *Rives* (1981) 116 Cal.App.3d

---

[11]This is merely the final illustration. The record contains myriad other instances of bad financial advice, conflict, skimming, lack of candor, concealment.

641, 647-648 [172 Cal.Rptr. 254]; *Wright* v. *Williams* (1975) 47 Cal.App.3d 802, 810 [121 Cal.Rptr. 194].)

■ An attorney's duty, the breach of which amounts to negligence, is not limited to his failure to use the *skill* required of lawyers. Rather, it is a wider obligation to exercise due care to protect a client's best interests in all ethical ways and in all circumstances.

■ The standards governing an attorney's ethical duties are conclusively established by the Rules of Professional Conduct. They *cannot* be changed by expert testimony. If an expert testifies contrary to the Rules of Professional Conduct, the standards established by the rules govern and the expert testimony is disregarded. (Cf. *Kirsch* v. *Duryea* (1978) 21 Cal.3d 303, 311 [146 Cal.Rptr. 218, 578 P.2d 935, 6 A.L.R.4th 334].)

■ Of course, a judge may resort to expert testimony to establish the standard of care when that standard is not a matter of common knowledge, (*Wilkinson* v. *Rives, supra,* 116 Cal.App.3d at pp. 647-648) or where the attorney is practicing in a specialized field. (*Wright* v. *Williams, supra,* 47 Cal.App.3d at pp. 810-811.) ■ However, Rosenthal's numerous, blatant and egregious violations of attorney responsibility were not breaches of legal technicalities for which expert testimony is required.[12] They were violations of professional standards; standards which the trial court was compelled to notice. (Evid. Code, § 451, subd. (c).)

Rosenthal's irresponsible "representation" of the Melchers trampled on basic attorney obligations: he abandoned the Melchers' best interests in deference to his own; he failed truthfully to disclose potential and actual conflicts of interests; and among other things, he failed to provide competent and independent legal advice.

Rosenthal persistently breached rules 4 and 5 of the Rules of Professional Conduct by engaging in business relationships with the Melchers which were potentially and actually adverse to them.

---

[12]Expert testimony was necessary in case Nos. 952950 and 958726, which involved standards of competency in the specialized field of tax law. The trial court found that Rosenthal held himself out as "possessing specialized skill, knowledge and expertise in individual tax planning." As an expert, he was held to the standards of similar specialists. (*Neel* v. *Magana, Olney, Levy, Cathcart & Gelfand, supra,* 6 Cal.3d 176, 188.) To assist the court in the tax cases, both the Melchers and Rosenthal presented the views of tax experts. The court made its decision based upon expert opinions. Rosenthal disagrees with the court's determination of the tax issues, but not because there was no expert testimony concerning his negligence. (See, *post,* pp. 1149-1152.)

Rule 4 of the Rules of Professional Conduct[13] simply provides, "a member of the State Bar shall not acquire an interest adverse to a client." Rule 4 is absolute; it provides no exception where the attorney acts with the consent of the client. (*Ames* v. *State Bar* (1973) 8 Cal.3d 910, 915 [106 Cal.Rptr. 489, 506 P.2d 625].)

Rule 5 provides: "A member of the State Bar shall not accept employment adverse to a client or former client, without the consent of the client or former client, relating to a matter in reference to which he has obtained confidential information by reason of or in the course of his employment by such client or former client."

Without belaboring the point which is patent even upon a cursory review of the facts: Rosenthal constantly thrust himself into conflicts with the Melchers, in violation of rules 4 and 5. He received undisclosed "profits" from the investment of the Melchers' funds; he created alter ego corporations and through them surreptitiously siphoned the Melchers' money into his pockets; without authority, he loaned himself their dollars; he secretly represented promoters of ventures into which he induced the Melchers to become investors. He involved himself in business ventures with the Melchers then took his profits ahead of his clients; he exposed the Melchers to losses and liabilities while avoiding personal liability himself; he induced the Melchers to discharge his obligations to their joint business ventures.

The litany could go on, almost without end. And each phrase would add to the mountain of evidence that Rosenthal violated rules 4 and 5. (See e.g., *Caldwell* v. *State Bar* (1975) 13 Cal.3d 488 [119 Cal.Rptr. 217, 531 P.2d 785]; *Ames* v. *State Bar, supra,* 8 Cal.3d 910; *Magee* v. *State Bar* (1962) 58 Cal.2d 423 [24 Cal.Rptr. 839, 374 P.2d 807].)

Rosenthal also violated rules 6 and 7 of the Rules of Professional Conduct: "A member of the State Bar shall not accept professional employment without first disclosing his relation, if any, with the adverse party, and his interest, if any, in the subject matter of the employment." (Rule 6.)

"A member of the State Bar shall not represent conflicting interests, except with the consent of all parties involved." (Rule 7.)

■ These rules require "full and fair disclosure to the [client] of all facts which materially affect his rights and interests." (*Neel* v. *Magana, Olney, Levy, Cathcart & Gelfand, supra,* 6 Cal.3d 176, 189.) Dual repre-

---

[13]References are to the Rules of Professional Conduct in effect during Rosenthal's representation of the Melchers, unless otherwise noted.

sentation is not automatically barred but is permitted by the rules only where disclosure is sufficient to "enable [the] client to make free and intelligent decisions regarding the subject matter of the representation." (*Lysick* v. *Walcom* (1968) 258 Cal.App.2d 136, 147 [65 Cal.Rptr. 406, 28 A.L.R.3d 368].)

Rules 6 and 7 were of no moment to Rosenthal. He repeatedly managed to involve the Melchers in business relationships with his other clients, without revealing his dual representation. His practice was to disclose as little as possible and conceal as much as possible. The facts, which are not in dispute, evidence Rosenthal's violations of rules 6 and 7.

Finally, Rosenthal breached the one rule with which everyone is familiar—rule 9. It is the rule which warns a lawyer never, never to commingle. Rosenthal commingled, depleted, misapplied and never, never accounted, all contrary to the rule. (See e.g., *Weir* v. *State Bar* (1979) 23 Cal.3d 564 [152 Cal.Rptr. 921, 591 P.2d 19]; *Black* v. *State Bar* (1972) 7 Cal.3d 676 [103 Cal.Rptr. 288, 499 P.2d 968]; *Bruns* v. *State Bar* (1941) 18 Cal.2d 667 [117 P.2d 327]; *Seavey* v. *State Bar* (1935) 4 Cal.2d 73 [47 P.2d 281].)

Rosenthal's negligence was overwhelmingly established without the aid of expert testimony. The rules set the standard (*Kirsch* v. *Duryea, supra,* 21 Cal.3d at p. 311); the facts revealed Rosenthal's violations, "The proof . . . was clear in its inculpatory impact." The trial judge drew the inescapable conclusion—Rosenthal was not merely negligent. His was "*'the type of conduct [not] to be condoned in the legal profession. . . .'*" (*Betts* v. *Allstate Ins. Co., supra,* 154 Cal.App.3d at pp. 716, 718.)

### b. *The Federal Land Bank Bond Transaction*

Rosenthal makes a number of other arguments which are couched in terms of sufficiency of the evidence. In large measure they are disagreements with the trial court, which chose not to believe him or accept his interpretation of the facts. The familiar answer to his contentions is that we view the evidence in the light most favorable to the Melchers, resolving all conflicts in their favor. (*Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183].)

His contention is that there was insufficient evidence of his negligence in the Federal Land Bank bond transactions. In essence, his argument is a lengthy exposition of conflicting views, heavily weighed in his favor. ■ In applying the substantial evidence rule, this court "*looks only at the evidence supporting the successful party, and disregards the contrary showing. (Citation omitted.)*" (*Campbell* v. *Southern Pacific Co.* (1978) 22 Cal.3d

51, 60 [148 Cal.Rptr. 596, 583 P.2d 121].) His arguments based on his experts' testimony cannot prevail.

 The trial court found four instances of malpractice by Rosenthal in connection with the Federal Land Bank bond transaction:

1. Rosenthal advised the Melchers to get into the scheme without conducting an adequate investigation.

2. An IRS-issued 1954 revenue ruling should have alerted Rosenthal to examine the transaction and advise changes or termination. He did none of these things.

3. Rosenthal should have advised the Melchers to settle after lack of success in the MacRae case. He didn't, and was silent about the IRS offer to settle with the Melchers.

4. Rosenthal made no attempt to salvage a deduction for the Melchers through the theft-loss mechanism.

Each of the findings is supported by substantial evidence. Mr. Harold S. Voegelin, the Melchers' tax expert, testified that any reasonably competent tax attorney would have conducted the factual investigation needed to reveal the transaction as a sham. Rosenthal admittedly did not do so. Rosenthal did not know Gibraltar couldn't lend the borrowed money.

Mr. Voegelin's opinion was that had Rosenthal known the facts, application of the well known tax doctrine of "form vs. substance" would have militated against the transaction.[14] His opinion was based on Rosenthal's critical failure to investigate the facts. His opinion is substantial evidence that Rosenthal negligently advised the Melchers into the transaction.

The uncontradicted evidence is that Rosenthal did not investigate *after* the 1954 revenue ruling. Mr. Voegelin testified that a reasonably competent tax attorney would have investigated at that point and having learned that the bonds had been resold by Gibraltar, would have rescinded or restructured

---

[14]Rosenthal's argument that Mr. Voegelin's testimony was so badly impeached as to render it insubstantial is based on his selective analysis of the facts. Mr. Voegelin's testimony was to the effect that applicable doctrine, not absolute certainty, should have warned Rosenthal away from the deal, but didn't. (See *Smith* v. *Lewis* (1975) 13 Cal.3d 349, 359 [118 Cal.Rptr. 621, 530 P.2d 589, 78 A.L.R.3d 231].)

the transaction.[15] His failure to investigate, alone, is sufficient evidence of his negligence. (*Aloy* v. *Mash* (1985) 38 Cal.3d 413, 418-419 [212 Cal.Rptr. 162, 696 P.2d 656]; *Smith* v. *Lewis, supra,* 13 Cal.3d at p. 359.)

There was ample evidence to sustain the court's finding that Rosenthal was negligent when he failed to settle with the IRS. In 1958, according to Mr. Voegelin, the tax court rendered an adverse decision in a case very similar to the Melchers'. And, in 1961, the 9th Circuit decided the MacRae case. It too was adverse to Rosenthal's position with respect to the bond transaction. Mr. Voegelin and Robert Wyshak, another tax expert, testified that after the MacRae case had been decided, the Melchers' chances of success were next to nil or nonexistent. According to Mr. Voegelin, a competent tax attorney would have tried to salvage something for the Melchers. Rosenthal didn't; he just continued to litigate.[16]

Based on substantial evidence, the trial court found Rosenthal negligent for failing to assert a theft-loss deduction. Rosenthal's complaint here, is not that there was insufficient evidence, but rather that there was no evidence the Melchers suffered a loss. His argument is that the 9th Circuit, in effect, said so. (*Estate of Melcher* v. *C.I.R.* (9th Cir. 1973) 476 F.2d 398.)

The 9th Circuit never ruled on the question. After the adverse decision in the tax court, and after Melcher had died and Day and Rosenthal had parted company, the Melchers asserted the theft-loss deduction in a motion to reopen. The tax court, in its discretion, denied the motion (29 TCM 1010) and the 9th Circuit affirmed. In the 9th Circuit the Melchers had to persuade the court there had been an abuse of discretion below. They were unsuccessful.[17] By contrast, the trial court in this case had to decide by a prepon-

---

[15]Rosenthal implies that an investigation would have been useless. He notes that Gibraltar issued confirmation slips and statements which indicated "as far as the Melchers and Rosenthal were concerned, the bonds were being held as collateral. Therefore, there was no reason to restructure the transaction to inform them that what was already the case, would be the case." Mr. Voegelin testified to a number of steps Rosenthal could and should have taken which would have revealed the true situation to him. Rosenthal also attempts to avoid the impact of Mr. Voegelin's testimony by "distinguishing" the revenue ruling from the Melchers bond transaction. His distinctions are without substance, and Mr. Voegelin so testified. We will not now, on appeal, second guess Mr. Voegelin's testimony.

[16]Again, Rosenthal quarrels with the trial court's assessment of the evidence. He suggests that *he* wasn't negligent; Melcher wanted to litigate. The record doesn't support him and if it did, the trial court wasn't compelled to believe him. Again, Rosenthal asserts that Mr. Voegelin was badly impeached. On the contrary, a reading of the transcript reveals that Mr. Voegelin was consistently of the opinion that after MacRae, the Melchers situation was hopeless and Rosenthal should have tried to settle. But, even if Rosenthal were correct, it was for the trial court, after a comparison of all the expert testimony, to decide which expert to believe.

[17]It is undisputed that the record before the tax court, and therefore in the 9th Circuit was insubstantial, compared with the very substantial evidence before the trial court.

derance of the evidence. It could and did consider all the evidence concerning the possibility that had it been properly asserted, Rosenthal could have obtained a theft-loss deduction for the Melchers. The trial court made uncontested findings that the elements of a theft-loss deduction were present and that Rosenthal negligently failed to assert them in the tax court. The 9th Circuit decision does not alter the fact that the trial court based its findings on substantial evidence.

c. *"The Empire Agreement"*

Rosenthal contends that in the absence of any substantial evidence, the trial court erroneously rejected his claim regarding the 1963 "empire agreement."

The purported "empire agreement" supposedly came into existence through an oral arrangement between Rosenthal and Melcher in 1963. Rosenthal was going to withdraw from the practice of law virtually to control the Melcher "empire"—principally the hotels, Melcher-Atkins Oil and Arwin and its subsidiaries. In exchange, according to Rosenthal, he was to receive a salary of $100,000 and "overhead" of $57,000 a year and he was to be an equal one-half partner with Melcher in the "empire." Melcher, Day and Arwin would have financial obligations; Rosenthal would not.

The trial court made two primary findings with respect to the "empire agreement." First, it found that all of Rosenthal's allegations and testimony concerning the existence of the "empire agreement" was *false*. Second, as an alternative, the trial court determined that if an "empire agreement" did exist, it was the product of Rosenthal's undue influence and had been breached by him.

Rosenthal doesn't dispute the findings of breach of fiduciary and contractual duties. ■ His position is that the first finding is wholly unsupported by evidence and is an example of the "arbitrary attitude of the trial court. . . ."

Rosenthal's insinuation that some evidence of the *nonexistence* of the "empire agreement" is required stands the law of evidence on its head. Rosenthal *qua* plaintiff had the burden of proving the existence of the "empire agreement" (Evid. Code, § 500) and the truth of his verified allegations about it. As the burden of proving his allegations was on Rosenthal, the trial court could properly "find 'not true' any allegation which he failed to establish as the truth" (*Brooks* v. *Brooks* (1944) 63 Cal.App.2d 671, 674 [147 P.2d 417]) and discredit Rosenthal. This the trial court did. It remained unconvinced of the 1963 "empire agreement," which could be proved only

by Rosenthal's discredited testimony. The trial court then made a finding against the party who had the burden of proof—Rosenthal. (*Coronet Constr. Co., Inc.* v. *Palmer* (1961) 194 Cal.App.2d 603, 618 [15 Cal.Rptr. 601].)

The trial court had myriad bases for rejecting as false the alleged agreement. The fact that Rosenthal was pressing his claim against a dead person, that the purported agreement was oral, that it was being presented by the person who stood to gain the most by its establishment and that there were no witnesses to the actual oral agreement, imposed upon the trier of fact the responsibility to pay the closest and most careful attention to Rosenthal's evidence, so as to prevent an injustice to Melcher's estate. The claim of an oral "empire agreement" against the deceased Melcher is precisely the sort that is often supported by false testimony, affords an opportunity for fraud against the decedent's estate and offers a great temptation to commit perjury. (*Turman* v. *Ellison* (1918) 37 Cal.App. 204, 209-210 [174 P. 396]; see also, *Paley* v. *Superior Court* (1955) 137 Cal.App.2d 450, 462 [290 P.2d 617]; *Estate of Henderson* (1932) 128 Cal.App. 397, 400-01 [17 P.2d 786].)

The trial court's decision not to believe Rosenthal's "empire agreement" story was well grounded in the realities of the case. Rosenthal was by no means a disinterested witness. He had a material financial stake in the existence of the agreement. This the trial court was entitled to take into consideration in its appraisal even if Rosenthal's testimony was uncontradicted. (*Curtis* v. *Mendenhall* (1962) 208 Cal.App.2d 834, 839 [25 Cal.Rptr. 627].)

Rosenthal's other testimony, regarding the 1956 retainer agreement was also discredited by the trier of fact. The trial court was entitled to take this into consideration under the doctrine of *falsus in uno, falsus in omnibus.* (*People* v. *Cook* (1978) 22 Cal.3d 67, 86 [148 Cal.Rptr. 605, 583 P.2d 130]; *Florez* v. *Groom Development Co.* (1959) 53 Cal.2d 347, 356 [1 Cal.Rptr. 840, 348 P.2d 200]; *Nelson* v. *Black* (1954) 43 Cal.2d 612, 613 [275 P.2d 473].)

Rosenthal's numerous breaches of the fiduciary duty owed by him to the Melchers; the lack of any written acknowledgement in Rosenthal's notes of the existence of the "empire agreement" throughout the five years from 1963 until Melcher's death; Doris Day's total ignorance of the existence of such an all-pervasive agreement; and inconsistencies between the purported oral "empire agreement" and the written hotel and Melcher-Atkins Oil agreements as well as Melcher's financial statements prepared by Rosenthal after 1963, all provided the trial court with underpinnings for its conclusion. (*Curtis* v. *Mendenhall, supra,* 208 Cal.App.2d at pp. 839-840.)

Rosenthal points to the judge's statement that "there is all of these chicken tracks of irrefutable facts" as proof that the trial court's disbelief was irrational. Rosenthal misses the mark. As the trial court noted, there were indeed "facts." In order for the facts to establish the existence of the "empire agreement" the trial court was required to believe Rosenthal. It was only his testimony which tied all the facts together and made them into the picture he was trying to paint. The trial court thought that Rosenthal's testimony was "the biggest balloon of hot air I have ever heard of in my life," and refused to follow the "chicken tracks" into Rosenthal's coop. It was entitled to do so. (*Curtis* v. *Mendenhall, supra,* 208 Cal.App.2d at p. 840.)

Even if the trial court were wrong, and there was an "empire agreement," Rosenthal would still not be entitled to enforce it. The trial court found that if there was such an agreement, it was the result of undue influence and had been breached. Rosenthal does not dispute these findings, at all. A contract which is the product of undue influence is not enforceable (*Gold* v. *Greenwald* (1966) 247 Cal.App. 296 [55 Cal.Rptr. 660]) just as a contract which has been materially breached may not be enforced. (*Pry Corp. of America* v. *Leach* (1960) 177 Cal.App.2d 632, 639 [2 Cal.Rptr. 425]; see 1 Witkin, Summary of Cal Law. (8th ed. 1973) p. 527.)

### 2. *Credibility*

Much of Rosenthal's case, particularly *qua* plaintiff, hinged on credibility. His lawsuits were for money allegedly due him under the 1956 retainer agreements and various other written and oral contracts with the Melchers. His explanations of the events of 18 or more years were critical. Were he telling the truth, his recovery would likely be assured. Were he not, he would lose and the Melchers would prevail. The court found that Rosenthal was an all-pervasive liar.

Rosenthal argues that the trial court arbitrarily discredited all of his testimony. On the contrary, the court exercised its discretion, under the law, with more than sufficient factual basis.

The trial court rejected all of Rosenthal's affirmative claims because it was unable "to accept as credible the testimony of the plaintiff [Rosenthal]." Rosenthal acknowledges, as he must, that on a Code of Civil Procedure section 631.8 motion a trial court is entitled to weigh the evidence and disbelieve witnesses it considers unreliable. (*County of Ventura* v. *Marcus* (1983) 139 Cal.App.3d 612, 615 [189 Cal.Rptr. 8]; *Miller* v. *Dussault* (1972) 26 Cal.App.3d 311, 316 [103 Cal.Rptr. 147]; *Greening* v. *General Air-Conditioning Corp.* (1965) 233 Cal.App.2d 545, 550 [43 Cal.Rptr. 662].)

Rosenthal's contention that the judge was arbitrary is based upon what he calls the court's "pivotal" finding: "Rosenthal's testimony regarding his conversation with Day on May 11, 1956 was false to such an extent as to make his entire testimony unworthy of belief." Rosenthal acknowledges that "it is within the province of the trial court to determine what credit and weight should be given to the testimony of any witness, and that the appellate court cannot control the trial court's finding or conclusion denying the testimony credence unless it appears that there are no matters or circumstances which at all impair its accuracy." (*Garfinkle* v. *Montgomery* (1952) 113 Cal.App.2d 149, 159 [248 P.2d 52].) He seriously insists that there are "no matters or circumstances" which discredit his testimony.

He first provides his own interpretation of the court's finding. His view is that "he told the truth about every single event in the 18 years of events about which he testified for 17 days." According to him, the only substantial evidence pertaining to the explanation of the retainer agreement he gave Day was his own testimony (which was "the truth") and his office log book. Therefore, a time discrepancy between the length of his testimony and the log book notation of time for the meeting must have been the *sole* reason for the judge's disbelief.

Rosenthal then argues that the trial court erroneously refused to admit into evidence a demonstration—a "script" of the May 11, 1956, Day-Rosenthal conversation. It is his contention that the "script" was relevant evidence of his credibility,[18] as it proved his explanation could have taken place in just 25 minutes.

The "script" was not some kind of contemporaneous recording of the actual conversation. It was a document Rosenthal prepared after he had rested his case, after the trial court had rendered its Code of Civil Procedure section 631.8 judgment against him and after the court had explained that it couldn't believe Rosenthal, in part because of the discrepancy between the day book entry and Rosenthal's testimony.

The court rejected the "script" in a proper exercise of its discretion. Admissibility of the "script" depended upon its relevance. (*Endicott* v. *Nissan Motor Corp.* (1977) 73 Cal.App.3d 917, 930 [141 Cal.Rptr. 95, 9

---

[18]Rosenthal urges two errors: (1) that the trial court refused to reopen the case to admit the evidence and (2) that the trial court did not believe the "script" was relevant evidence. The former does not appear to have been the reason the "script" was not admitted. Such reason was never suggested during the colloquy concerning the admissibility of the script and the trial court never gave it as a reason. The court did not hesitate to allow Rosenthal to reopen for the admission of other evidence several days after the "script" had been proffered. It does not appear there is any validity to Rosenthal's contention that the "script" was rejected because the trial court would not reopen Rosenthal's case for that purpose.

A.L.R.4th 481]; *Culpepper* v. *Volkswagen of America, Inc.* (1973) 33 Cal.App.3d 510, 521 [109 Cal.Rptr. 110]; see 1 Jefferson Cal. Evid. Bench Book (2d ed. 1982) p. 559.) The "script" was not relevant as it could do nothing to enhance Rosenthal's credibility. It was a concoction by Rosenthal which did not comport with the other evidence concerning the meeting.

Rosenthal's own testimony put a lie to the "script." He said, on the witness stand, that on May 11, 1956, he "discussed or told Doris [Day] about at least two and maybe three documents. . . . The May 11, 1956 agreement. . . . An agreement with Marty Melcher" and possibly "the artist-manager agreement between Marty as the personal manager and Doris as the client." In later testimony, he was more certain that they had talked about the third agreement. In his testimony he detailed the elaborate procedure he used with Day—how he asked her to read the agreement, explained each phrase minutely, paraphrased paragraphs of the agreements, answered questions and gave his favorite explanatory examples to her. His essentially narrative testimony, which at times only alluded to the fuller exchange he claimed took place on May 11, 1956, consists of countless exquisite details. His testimony is reported in 37 pages of the transcript.

Rosenthal's "script" is a series of statements and responses, totally lacking in the details of his testimony. It is a purported dialogue about one, not three agreements. It has none of his explanatory examples. It appears to be nothing more than what Rosenthal was able to cull out of the transcript to fit the time allotted to the meeting in his records.[19] It bears little resemblance to his testimonial depiction of the occurrence.

In this posture the script was simply not relevant. It would have been useless to enhance his credibility. It created a "heads I win, tails you lose" situation for Rosenthal. If his testimony was a true picture, the "script" was false; if his "script" was an accurate portrait, his testimony was inaccurate. Either way, Rosenthal came out not truthful and his credibility was not bolstered. The trial court properly excluded the irrelevant "script."

Rosenthal also argues that even if he is wrong about the "script," the trial court was, nevertheless, arbitrary in discrediting all of his testimony.

---

[19]Rosenthal makes much of a supposed mistaken argument—that all three agreements were discussed in a 25-minute period. His log book (exh. 692, bk. 21, items 814, 815) shows two meetings with Day on May 11, 1956. The first was a 25- or 45-minute meeting (the entry has been altered) and the other was a 25-minute meeting. Three items are mentioned in the first meeting—"review financial statements" and the Day-Melcher agreements. The second meeting refers only to the retainer agreement. The apparent discrepancy between 25, 50 or 70 minutes is of no moment. There is no testimony with reference to the first meeting, the financial statements, etc. Rosenthal testified to *one* instance in which all three agreements were on his desk and he reviewed them all with Day. How long he took is not the issue. It's what he said as reflected in his testimony compared with the "script."

Again, he focuses on the May 11, 1956, conversation and claims there is nothing to show he was an inaccurate or untruthful witness. Hence, according to him, the trial court's application of the doctrine in *falsus in uno, falsus in omnibus* (*People* v. *Cook, supra,* 22 Cal.3d 67, 86; BAJI No. 2.22) was error.

The trial court had ample basis for its disbelief. Contrary to Rosenthal's assertion, his testimony was not "completely uncontradicted." Rosenthal testified that he discussed the 1956 retainer agreement at length with Day and explained the meaning of every paragraph, line and participle in it. On the other hand, Day contended she signed the agreement without reading it and was never even informed that the document she was signing was a retainer agreement. She expressly denied that Rosenthal had given her any explanation of the agreement. Indeed, she testified that it was not until many years later that she knew the agreement existed; she first saw the agreement at one of her depositions in this case. The trial court was free to accept her version and reject Rosenthal's conflicting evidence. (*Pierson* v. *Superior Court* (1970) 8 Cal.App.3d 510, 518 [87 Cal.Rptr. 433].)

Rosenthal's testimony was contradicted by his log-book entry. He was a notorious note keeper, but not so for his "explanations" on May 11, 1956. ██ It is settled that even the most positive testimony of a witness may be contradicted by inherent improbabilities as to its accuracy contained in the witness's own statement of the transaction. (*Davis* v. *Judson* (1910) 159 Cal. 121, 128 [113 P. 147].)

The trial court had an opportunity to observe Rosenthal testify over a period of 17 days. ██ Its observation of Rosenthal as a witness was a sufficient basis for disbelieving him. "[T]he manner of the witness in testifying may impress the court with a doubt as to the accuracy of his statement. . . ." (*Ibid.*)

██ The trial court was concerned with the improbability that Rosenthal could have remembered the May 11, 1956, conversation in the incredible detail to which he testified in 1974, 18 years later. The trial court commented that "the only thing he didn't tell us is whether the sun was shining that day." His remarkable memory over the great lapse of time was a proper factor influencing the trial judge's decision. (*La Jolla Casa de Manana* v. *Hopkins* (1950) 98 Cal.App.2d 339, 346 [219 P.2d 871]; *Estate of Vetter* (1930) 110 Cal.App. 597, 601 [294 P. 438]; see also, *Curtis* v. *Mendenhall, supra,* 208 Cal.App.2d 834, 839-40.)

██ Furthermore, the trier of fact, in passing upon the credibility of a witness, is entitled to consider his interest in the result of the case. (*Smith*

v. *Howard* (1958) 158 Cal.App.2d 343, 349 [322 P.2d 1034].) A witness may be impeached by showing his interest in the outcome of the litigation. Rosenthal had an enormous financial interest in the outcome of the litigation, one sufficiently great to cast doubt on the veracity of his testimony.

Rosenthal's argument that the trial court arbitrarily discredited all of his testimony is entirely without substance.

### 3. *Fraud*

The trial court found two instances of fraudulent[20] conduct by Rosenthal. First, with respect to the Kencal and Marlo Kentucky drilling program, the trial court found that the transaction was "fraudulent" and that it was "designed by Rosenthal and his agents with a fraudulent intent to receive unwarranted and unauthorized compensation and kickbacks." Next, the trial court found that Rosenthal had "wrongfully and deliberately withheld" $30,684.69 in the trust account belonging to the Melchers during the last six years and that this conduct by Rosenthal "was oppressive and fraudulent."

Rosenthal claims that neither of the above findings was supported by evidence.

The facts are not in dispute, nor is Rosenthal's quarrel with the sufficiency of the evidence. Rosenthal contests the determination by the trier of fact in the presence of contradictory evidence.

Rosenthal claims the trial court "blithely and unjustifiably" ignored his testimony that (1) he used the unorthodox procedure of bookkeeping "to show the expenditure of all of the investors' funds in 1966" in order to obtain tax deductions for the investors in that year; (2) that on the same day the $45,000 was transferred to the Rosenthal's firm account, the same firm sent $21,000 to Kentucky "in payment of sums owing . . . in connection with the drilling program in December of 1966 in Kentucky"; (3) that Rosenthal only retained the funds "temporarily" and that he more than repaid them; and (4) that the bookkeeping entries were made by clerks of the Rosenthal firm with whom "Rosenthal rarely had any direct contact."[21]

---

[20]Rosenthal correctly observes that this issue is *sui generis;* that it relates only to him *qua* defendant and cannot have any effect on his rights *qua* plaintiff. Indeed, the findings are significant only insofar as they support an award of punitive damages.

[21]As an afterthought, Rosenthal argues in his responding brief that the mistake was really labeling the $45,000 as legal fees from the drillers. Instead, "[i]t should have been treated as fees from MOA [Melcher-Atkins Oil]," for salaries, legal fees and general expenses owed to the Rosenthal firm. With chameleon-like ability to change color, Rosenthal has added another hue to his rainbow of insults to the intelligence of the judicial system. We are supposed to accept his "I never touched the money" version of the check fraud at the same time that we buy his "it was really mine" story (one never hinted at by anyone until his reply brief and not supported by a shred of evidence). We reject it.

In the face of conflicting evidence, the trier of fact is "the sole judge of the credibility of witnesses and the weight of the evidence. . . ." (*In re Clyde H.* (1979) 92 Cal.App.3d 338, 344 [154 Cal.Rptr. 727]; see *Marker* v. *Wendelken* (1955) 136 Cal.App.2d 276, 279 [288 P.2d 981]; *Pierson* v. *Superior Court* (1970) 8 Cal.App.3d 510, 518 [87 Cal.Rptr. 433].)

Moreover, the facts showed that Rosenthal's claim to have returned $21,000 to the Kentucky investors was false. There was a transfer of $21,000 on the date in question. But, it was made *in the form of a loan* from the Rosenthal firm to Melcher-Atkins Oil. Of course, a loan is expected to be repaid, and lends support to the court's finding that Rosenthal asserted ownership of the money, took it as his and never intended to repay it! The loan was without doubt made with an actual intent to conceal the origins of the money.

Rosenthal's argument of "the other dude did it" (his clerks) is hardly more plausible. Rosenthal was the head of the firm; he received regular financial statements; and he actively participated in the decision to transfer the trust funds. Rosenthal's arguments constitute questions of fact clearly in the province of the trier of fact, and will not be disturbed on appeal.

Regarding the fraudulent retention of $30,684.69 belonging to Rosenthal's clients in his trust account, Rosenthal argues that there was not one "scintilla of evidence that Rosenthal had fraudulent intent." Rosenthal asserts that he had a "claim of right" to the funds, because the parties in the Melcher-Atkins Oil, ventures including Rosenthal, were in litigation with each other. As such, Rosenthal argues, the "natural inference" would be that he was "reserving" the funds pending the outcome of litigation, not that he had any fraudulent intent with respect to them.

We cannot agree with the "natural inference" where Rosenthal could have paid the money into court or at least disclosed its existence to the Melchers. Indeed, the "natural inference" from its concealment is an improper intent.

Furthermore, Rosenthal's claim that in order to show fraud, "actual concealment" or misrepresentation must be found is legally erroneous. Rosenthal received the funds while acting in a fiduciary capacity with the Melchers. An intentional failure to disclose is an actionable fraud in the presence of a fiduciary duty to disclose. (*Black* v. *Shearson, Hammill & Co.* (1968) 266 Cal.App.2d 362, 367 [72 Cal.Rptr. 157]; *Renaissance Realty Inc.* v. *Soriano* (1981) 120 Cal.App.3d Supp. 13, 16 [174 Cal.Rptr. 837].)

Rosenthal claims he did not have the "intention" to fail to disclose as he "did not know how much was in the trust account or who had claims to it."

This contention has been discredited by the trial court: (1) Rosenthal laid a "claim of right" to the funds during 1968-1974. The "natural inference" would be that he knew of the existence of the funds to be able to "claim a right" to them; (2) Rosenthal's argument, in his reply brief, that he couldn't have known because his accountant left the Rosenthal firm in December 1968, is of no help to him. The evidence only showed that the funds were in the trust account in 1968, but not when they arrived. Rosenthal presumably received statements for 1967 and 1966, which would have reflected the existence of the funds; (3) Rosenthal's persistent failure to make available the trust ledger cards and journal sheets until the trial court, in outrage, ordered him to do so, was correctly interpreted by the trier of fact—despite Rosenthal's disingenuous excuses—as a deliberate attempt to conceal any misappropriation of funds in the account.

Rosenthal further argues that the court intended to find "constructive fraud," but the "findings appear to sound in actual fraud."

The findings correctly found "actual fraud" in the deliberate retention of the ledgers which, pursuant to his fiduciary duty, he was under an obligation to disclose.[22]

In any event, even if the court could only find "constructive fraud," it would be sufficient. The fraud findings relate only to the trial court's award of punitive damages, for which "constructive fraud" or oppression constitutes an appropriate basis. (*Vale* v. *Union Bank* (1979) 88 Cal.App.3d 330, 340 [151 Cal.Rptr. 784].) Moreover, the court did find fraudulent conduct in the "Kentucky kickback" scheme, and Rosenthal's outrageous conduct in that scheme amply justified an award of punitive damages.

### 4. *Findings*

The trial court made carefully delineated findings, setting out, with precision, each material fact in issue. Rules of Court, rule 232, in effect at the time, required nothing more. (See e.g., *Pollak* v. *Kinder* (1978) 85

---

[22]Rosenthal disagrees. He argues that at worst, this is an instance of breach of fiduciary duty. He concedes that "[i]t may be that Rosenthal should have acted more diligently to ascertain the Melchers' credit balance, if any, and deposited those funds with the court. But lack of diligence is not fraud." We disagree. The facts presented here show that, not for a short time, but for *five years* Rosenthal, using various excuses, "lacked the diligence" to ascertain the whereabout of the ledgers: This smacks more of "active concealment than of lack of diligence."

Cal.App.3d 833, 839 [149 Cal.Rptr. 787]; *Kanner* v. *Globe Bottling Co.* (1969) 273 Cal.App.2d 559, 567 [78 Cal.Rptr. 25].) Undaunted, Rosenthal makes a generalized assault on the findings. He complains that they are organized by subject matter, are not concise, do not fairly disclose the basis for the court's determination and raise more questions than they answer. ▪ The short response to his broadside is that no special form is mandated, so long as there are findings on each material issue. (*Kanner* v. *Globe Bottling Co.*, *supra*, 273 Cal.App.2d at p. 568.) Ultimate facts are all that must be found; more would be superfluous. (*South Bay Irr. Dist.* v. *California-American Water Co.* (1976) 61 Cal.App.3d 944, 997 [133 Cal.Rptr. 166]; see also, *Seeley* v. *Combs* (1966) 65 Cal.2d 127, 132 [52 Cal.Rptr. 578, 416 P.2d 810]; *City of Signal Hill* v. *Wyse* (1935) 9 Cal.App.2d 641, 643 [50 P.2d 1076].) ▪ "Findings serve the limited function of informing the parties of disputed factual determinations in order that a claim of error may be properly reviewed upon . . . appeal." (*Pollak* v. *Kinder*, *supra*, 85 Cal.App.3d 833, 839; *Baron* v. *Baron* (1970) 9 Cal.App.3d 933, 937 [88 Cal.Rptr. 404].)

The findings seemed to have served their purpose. They appear more than adequate to have enabled Rosenthal to launch a more than 300-page (opening and reply briefs) attack on the judgment. But, if some of the findings are inadequate, Rosenthal has not established that he is entitled to a reversal on that ground. His sweeping challenge merely alludes to a few of the 181 findings.[23]

Rosenthal cannot compel reversal of the judgments simply by attacking one or more particular findings. As long as there are other findings which support the judgment, this court will presume the judgment was based on those findings. ▪ "However, unsupported or inconclusive as some findings may be, a judgment must be affirmed if there is at least one clear finding sustained by the evidence." (*Conley* v. *Lieber* (1979) 97 Cal.App.3d 646, 658 [158 Cal.Rptr. 770]; *Kreisa* v. *Stoddard* (1954) 127 Cal.App.2d 627, 663 [274 P.2d 164].)

---

[23]Rosenthal's approach borders on the ludicrous. He complains that he has been "forced to sift through 91 . . . pages of findings. . . . to figure out what the court really meant." (Presumably he succeeded, as his lengthy briefs demonstrate.) Then, he has the gall to suggest that the findings "are in the record for the court to examine for adequacy." Perhaps implicit in his helpful hint is an invitation for this court to read them all and "sift through" his almost 800 pages of objections, counterfindings and requests for special findings to uncover what he really wants to assert. We decline his generous invitation. (*Pacific Water Conditioning Assn., Inc.* v. *City Council* (1977) 73 Cal.App.3d 546, 559 [140 Cal.Rptr. 812].)

In his general way, Rosenthal attacks the findings in the Federal Land Bank bond transactions.[24] Rhetorically, he asks questions which, if answered in the form of specific findings, would convert the findings into evidentiary minutia. The trial court made complete findings factually itemizing the various conflicts of interests, breaches of fiduciary duty and negligence as an attorney which all sustain its judgment with respect to the bond transactions. Rosenthal points to no material fact omitted by the court; this court perceives none. (*United Business Com.* v. *City of San Diego* (1979) 91 Cal.App.3d 156, 182-183, fn. 13 [154 Cal.Rptr. 263].)

Rosenthal also complains that there is no finding on the reasonable value of his bond transactions services. First, the trial court did make an express finding that none of Rosenthal's services had any value (finding No. 12). Second, no finding was necessary. His conflicts of interest rendered his services valueless and required no finding on the reasonable value of his fees. (*Conservatorship of Chilton* (1970) 8 Cal.App.3d 34, 43 [86 Cal.Rptr. 860].)

Rosenthal also bemoans the absence of findings on the reasonable value of his services in two cases involving Day's television and film contracts. His argument is without foundation. He admits the two claims were based on the 1956 retainer agreement which the trial court found unenforceable. Plainly, he would not have been entitled to a favorable finding on the issue of fees for services rendered pursuant to the unenforceable contract. ▮ The failure to find on an issue supported by substantial evidence is harmless when the finding may be implied from other findings or where it would necessarily have been adverse to the appellant. (*South Bay Irr. Dist.* v. *California-American Water Co., supra,* 61 Cal.App.3d at p. 995; *McCullough* v. *Jones* (1970) 11 Cal.App.3d 270, 275 [89 Cal.Rptr. 646]; *Pry Corp. of America* v. *Leach, supra,* 177 Cal.App.2d 632, 636-637; cf. *Kanner* v. *Globe Bottling Co., supra,* 273 Cal.App.2d at p. 566.)

Third, Rosenthal did not ask the court to award him the reasonable value of his services in the two cases. Indeed, he eschewed any desire for a

---

[24]Rosenthal also questions the findings that the Melchers signed the 1956 retainer agreements as a result of undue influence. He concedes, however, that "the inadequacy of the findings [of undue influence] may perhaps be remedied by findings on other grounds." In light of the concession, as well as the fact that most of those other findings are not challenged and our determination of issues affecting those other findings, we do not need to discuss his attack on the undue influence findings. The judgment would remain unaffected irrespective of our disposition of his challenge. Nevertheless, we emphasize that the trial court's findings that the 1956 retainer agreements were the product of undue influence are fully supported by the evidence. Civil Code section 2235, as it read in 1956, created the presumption of undue influence upon which the court could rely. (*Gold* v. *Greenwald* (1966) 247 Cal.App.2d 296 [55 Cal.Rptr. 660].) There was no cognizable rebuttal.

quantum meruit recovery in the underlying 1956 retainer lawsuit. Finally, to reiterate, the court did make the express finding Rosenthal says is missing. The court found that the reasonable value of all his services was zero.

Rosenthal last challenges the two findings of fraud: one that he had a fraudulent intent to receive kickbacks from oil contractors (the Melcher-Atkins Oil $45,000 scam) and the other that he fraudulently retained $30,000 of the Melchers' money in his trust account. Again, he is unhappy with the form of the findings; they are "disembodied," "scattered," they don't track the pleadings. His contention concerning form has been dispensed with above.

In his reply brief Rosenthal adds that he can't locate sufficient specification of the elements of the tort, "fraud," in the court's findings. It is not clear what the real thrust of his argument is. He notes that the findings may really support theft ("conversion"). Perhaps so. He says the "factual underpinnings" of fraud are nowhere stated. Nonsense. The factual underpinnings are indeed present in the volumes of findings which describe both situations. Those findings show that Rosenthal intentionally, rather than negligently, misled the Melchers, provided false information and actively concealed the truth from them. In other words, the findings show fraud. (See *Nelson* v. *Gaunt* (1981) 125 Cal.App.3d 623, 635-636 [178 Cal.Rptr. 167].)

The findings explicitly, concisely and with clarity reveal the grounds for the judgment. Rosenthal's attack can avail him nothing.

Rosenthal specifically challenges the trial court's finding that the statute of limitations did not bar the Melchers' negligence causes of action with respect to the Federal Land Bank bond litigation.

On May 5, 1969, Rosenthal brought an action against the Melcher estate for legal fees of $17,500 due for the Federal Land Bank bond litigation. The Melchers responded with a cross-complaint for attorney negligence, to which Rosenthal asserted the statute of limitations, Code of Civil Procedure section 339, subdivision 1.

The trial court found that "the Melcher parties could not reasonably have been expected to, nor did they, discover the acts or omissions constituting causes of action against Rosenthal . . . until they had obtained independent counsel and accountants. . . . No damages were sustained by Day and Melcher in the bond transaction, the bond litigation . . . until the judgment of the Tax Court was entered. . . ."

Rosenthal contends that the above finding is defective as a matter of law and the cause of action is barred by the statute of limitations.[25]

It is now settled that the statute of limitations in an action for attorney malpractice starts to run when (1) the plaintiff knows, or should know, all the essential facts to establish the elements of his cause of action for legal malpractice, (*Neel* v. *Magana, Olney, Levy, Cathcart & Gelfand, supra*, 6 Cal.3d 176, 190; *Horne* v. *Peckham* (1979) 97 Cal.App.3d 404, 416 [158 Cal.Rptr. 714]; *Fleury* v. *Harper & Row, Publishers, Inc.* (9th Cir. 1983) 698 F.2d 1022, 1028) and (2) the client has sustained appreciable and actual damage. (*Budd* v. *Nixen* (1971) 6 Cal.3d 195, 203 [98 Cal.Rptr. 849, 491 P.2d 433]; *Electronic Equipment Express, Inc.* v. *Donald H. Seiler & Co.* (1981) 122 Cal.App.3d 834, 853 [176 Cal.Rptr. 239].)

The Melchers suffered substantial damage in connection with the Federal Land Bank Bond "tax-shelter" scheme. The "tax shelter" transaction was entered by the Melchers in 1953. It was not until 1970, that the United States Tax Court in *Estate of Melcher* v. *Commissioner* (1970) 29 TCM 1010, affirmed (9th Cir. 1973) 476 F.2d 398, disallowed all of the interest deductions claimed by the Melchers on the grounds that the entire transaction was nothing but a sham.

Rosenthal contends that the statute of limitations had run under the discovery rule. We cannot agree.

The determination of the time when plaintiff suffered damage is a question of fact. (*Budd* v. *Nixen, supra,* 6 Cal.3d 195, 202.) Moreover, in some cases, only the trier of fact can ascertain when the consequential damage became sufficiently appreciable to put a reasonable person on notice. (*Oakes* v. *McCarthy Co.* (1968) 267 Cal.App.2d 231, 255 [73 Cal.Rptr. 127].)

Rosenthal alleges that on three occasions previous to the 1970 judgment the Melchers should have been put on notice of Rosenthal's possible negligence.

Rosenthal first contends that the Melchers should have discovered the negligence in 1959, when an independent review ordered by Melcher from Price Waterhouse & Co., informed the Melchers that ". . . [i]t appears reasonable to assume that the items relating to the above bond transaction

---

[25]This issue affects Rosenthal *qua* defendant, only. As the Melcher's affirmative judgment for Rosenthal's tax malpractice has been settled and Rosenthal released from liability it is moot. But it exemplifies his misapprehension of his responsibilities, and is therefore included in this opinion.

will be disallowed." This contention is particularly repugnant in face of the trial court's finding that "Rosenthal negligently advised and convinced Melcher that the advice of Price Waterhouse & Co. was improper and inaccurate." As a result, "the written report itself was completely discounted by Melcher."

Alternatively, Rosenthal argues that the Melchers should have discovered the possible attorney malpractice in 1958, when the Melchers received the first IRS statutory notice of deficiency regarding the transaction, citing *Moonie* v. *Lynch* (1967) 256 Cal.App.2d 361 [64 Cal.Rptr. 55].

In *Moonie,* a malpractice action against an accountant, the court did say the notice of penalty gave the client the cause of action. (*Id.,* at p. 364.) Moonie's facts are manifestly different from our case. No continuing relationship was involved there; no continued misadvice; no undue influence; no concealment. Here, it was Rosenthal who negligently advised the Melchers to enter into the transaction; Rosenthal who represented them in the bond litigation; Rosenthal who failed to communicate such a settlement offer to the Melchers and who did not recommend or effectuate a settlement. The logic of this case dictates that it was Rosenthal who advised the Melchers that the IRS erroneously disallowed the tax deduction and that it could be successfully challenged.

In the context of the continuing attorney-client relationship had Rosenthal genuinely believed in his challenge to the IRS notice of deficiency, his error would have been remediable. A continuing relationship implies a continuing duty to remedy the error, and thus extends the period of limitation. (*Heyer* v. *Flaig* (1969) 70 Cal.2d 223, 230 [74 Cal.Rptr. 225, 449 P.2d 161]; *Fazio* v. *Hayhurst* (1966) 247 Cal.App.2d 200, 203 [55 Cal.Rptr. 370].)

The trial court found that "[a]ll of the information which Day and Melcher ever received prior to Melcher's death with respect to any of these business ventures and investments came from, and was only available to them through, Rosenthal . . . and each of them reposed great trust and confidence in him."

Melcher, with his unquestioning blind faith in Rosenthal, and without any contrary legal advice could not be deemed to have been put on notice of Rosenthal's legal malpractice where it was Rosenthal, in his all consuming role of investment adviser, tax account and lawyer, who assured him of the wisdom of his investments.

Applied to a fiduciary the date-of-discovery rule is "particularly appropriate when the defendant maintains custody and control of a plaintiff's

property or interests." (*April Enterprises, Inc.* v. *KTTV* (1983) 147 Cal.App.3d 805, 827 [195 Cal.Rptr. 421].) "Such a relationship compels a rule of delayed accrual to avoid barring a victim of wrongful conduct from asserting a cause of action before he could reasonably be expected to discover its existence." (*Ibid.*)

Rosenthal further contends that the Melchers should have discovered the attorney malpractice when they first became obligated to " 'incur and pay attorney's fees and legal costs and expenditures' " to resist litigation engendered by the malpractice. (*Budd* v. *Nixen, supra,* 6 Cal.3d 195, 201.)

This contention is likewise illogical, for the same reasons that the deficiency notice didn't start the statute running: At all times, Rosenthal stood in a fiduciary relationship with the Melchers, and he was the one assuring them of the value of the services and validity of the claims by which they were incurring fees.

To accept Rosenthal's idea of notice to the Melchers would be wholly to negate the *Neel* and *Nixen* rule. "[T]he client may not recognize the negligence of the professional when he sees it." (*Neel, supra,* 6 Cal.3d at p. 188.) Consequently, "where confidential relationship, such as the relationship between attorney and client, exists, failure to discover the facts constituting fraud or misrepresentation may be excused. . . ." (*Jensen* v. *Sprigg* (1927) 84 Cal.App. 519, 526 [258 P. 683]).

If anything, Rosenthal caused the statute to start at a later, rather than earlier date. He again breached his fiduciary duty by failing to disclose to the Melchers all the facts regarding his possible negligence which materially affected their rights and interests. Where a fiduciary has a duty to disclose, "any material concealment or misrepresentation will amount to fraud. . . ." (*Pashley* v. *Pacific Elec. Ry. Co.* (1944) 25 Cal.2d 226, 235 [153 P.2d 325]; see, *Boyd* v. *Bevilacqua* (1966) 247 Cal.App.2d 272, 290 [55 Cal.Rptr. 610].) Thus, "[p]ostponement of accrual of the cause of action until the client discovers, or should discover, the material facts in issue vindicates the fiduciary duty of full disclosure; it prevents the fiduciary from obtaining immunity for an initial breach of duty by a subsequent breach of the obligation of disclosure." (*Neel, supra,* 6 Cal.3d at p. 189.)

To hold here, as Rosenthal suggests, that the Melchers should have discovered their cause of action for his tax attorney's malpractice sooner than they did, amounts to an expectation that every client in a prolonged attorney-client relationship should have independent counsel at all times to monitor the actions of the first attorney. Such an expectation is, of course, ludicrous.

The trial court was correct. In this instance a cause of action did not accrue until the Rosenthal-Melcher relationship had been severed.

### 5. *Pretrial Issues*

#### a. *Discovery and Denial of a Continuance*

Rosenthal, *qua* defendant plaintively wails that he has been deprived of a fair trial because he was prevented from undertaking 11th-hour discovery and was denied a continuance of the trial so that he could engage in discovery. His cry is akin to that of the man who, having killed his mother and father, seeks mercy as he is an orphan. Even an abbreviated discovery scenario will put the court's ruling into focus:

The litigation involved numerous transactions in which Rosenthal had represented the Melchers; transactions in which Rosenthal had been an active participant; transactions concerning which Melcher had taken whatever knowledge he had with him to his grave; transactions about which Day and Terrence Melcher knew next to nothing. Rosenthal had all the information, files and documents; the Melchers had none. Understandably, the Melchers needed information.

The Melchers sought discovery early in the litigation. In late 1968, they served a set of interrogatories on Rosenthal in case No. 952239 (the "1968 Interrogatories") and in July 1969, they served another set of interrogatories on him in case No. 938682 (the "1969 Interrogatories"). Rosenthal's performance was, basically, the same in each case. His replies were essentially nonresponsive or uninformative. He was ordered to provide further answers. Again, many of his answers were inadequate or nonresponsive. After what Rosenthal euphemistically calls "some initial fencing over interrogatories" the trial court concluded that Rosenthal's failure to answer was willful. On November 20, 1969, the court entered its first order staying all proceedings "until such time as [Rosenthal] made further answers" to the 1968 interrogatories. Rosenthal was apparently unconcerned, as he provided further answers to neither the 1968 nor the 1969 interrogatories. On January 26, 1971, the trial court felt compelled, again, to enforce compliance with discovery by making a stay order. Rosenthal was ordered to give "full and complete answers to interrogatories No. . . . 40(g), 47 and 48. . . . All further proceedings . . . including the deposition of Doris Day are stayed. . . ." He requested clarification and reconsideration, which was denied. On March 5, 1971, the trial court reiterated, "Stay order is to remain in effect until such time as [Rosenthal] has adequately answered interrogatories."

Rosenthal seemingly felt that making discovery was not a high priority item. For two years he did nothing to relieve himself of the stay orders. Then, in February 1973, he filed what *he* deemed to be "partial" answers to the 1969 interrogatories.[26] He provided no further answers to the 1968 interrogatories, partial or otherwise.

In mid-1973, pursuant to stipulation, the 13 pending cases were consolidated "for all purposes."[27] Pursuant to the same stipulation, the parties agreed to seek March 4, 1974, as the trial date and to allow amendments to pleadings without leave of court.[28] In mid-June 1973, Rosenthal had still not complied with the early discovery orders; the stays were still in effect.

In accordance with the stipulation the trial court set March 4, 1974, as the trial date. As permitted by the stipulation, on October 2, 1973, the Melchers amended their pleadings specifically to allege Rosenthal's malpractice.[29] Even then, Rosenthal did not rush to remedy his discovery situation. On November 30, 1973, more than five years after the litigation had commenced, nearly five years after the 1968 interrogatories had been served and more than four years after the trial court had issued its stay order, Rosenthal filed *incomplete* answers to the 1968 interrogatories. He "held in suspense" answers to more than 50 interrogatories. He admitted the stays were still in effect and he had no right to make discovery until they were lifted.

Trial was now uncomfortably close, and it appeared, would actually begin, as scheduled, on March 4, 1974.[30] Using as a rationale the amended pleadings (to which he had stipulated) Rosenthal asked for a continuance of the trial date. Suddenly, two months after the amendments, he needed time in which to do extensive discovery on the "new" allegations of malprac-

---

[26]The document is entitled "Plaintiffs' (Cross-Defendants') Answers (Partial) to Interrogatories 47, 48." In the latter document Rosenthal said, "the following answers do not purport to include certain claims. . . . These claims will be more fully delineated . . . *in further answers*, to be filed herein. . . ." (Italics added.)

[27]Eight of the cases had previously been consolidated on December 5, 1969.

[28]Rosenthal had entered into the agreements in the latter part of April 1973; the formal stipulation, incorporating the agreement, was filed on June 18, 1973.

[29]The Melchers amended case No. C 938682 to allege attorney negligence and case No. C 947515 to allege malicious prosecution, abuse of process, and legal malpractice.

[30]Trial was actually past due. Rosenthal's complaint in case No. 938682 had been filed in August 1968, and his complaint in case No. 942239 had been filed in October 1968. In mid-1973 the parties had stipulated to extend the mandatory dismissal date under Code of Civil Procedure section 583, subdivision (b) to May 31, 1974.

tice.[31] Yet, while seeking a continuance in order to do discovery, he did nothing to relieve himself of the stays. He simply conceded that his discovery was still barred by a stay order and "anticipated" filing complete answers to the interrogatories on some unspecified future date. He clearly understood that only after he had provided discovery would he be able to proceed with discovery. Thus, as late as December 5, 1973, Rosenthal, admittedly, had not complied with court orders which would have opened the discovery door for him. Rosenthal's solution—further delay—was rejected by the trial court. His motion for continuance was denied.

Without providing the requisite (and promised) further answers or in any other way obtaining relief from the stay orders, just 12 days after recognizing that he had no right to make discovery, Rosenthal acted: He served a set of interrogatories on the Melchers, followed in short order by eight more sets and notices of several depositions, including Day's.[32]

Faced with a veritable deluge of last minute requests for discovery, which they believed were both oppressive and precluded by the stay orders, the Melchers sought a protective order. The trial court granted their motion that the interrogatories propounded by Rosenthal "need not be answered" and the depositions noticed by him "shall not be taken." The trial court also denied Rosenthal's renewed request for a continuance of the trial date.

(1) *The Protective Orders*

Rosenthal's theme is that if only he had been able to discover more about the Melchers' negligence causes of action, he would not have been disadvantaged *qua* defendant.[33] He complains that the trial court erroneously

---

[31]In fact, this was not Rosenthal's first notice of the Melchers' malpractice claims against him. As early as August 1972, the Melchers had amended their pleadings specifically to allege Rosenthal's negligence in case Nos. 952950 and 958726, two of eight cases consolidated in 1969. Furthermore, the 1973 amendments added negligence as an additional theory of recovery or as a defense, without alleging additional facts. The same was true with respect to the amendment adding causes of action for malicious prosecution and abuse of process. The underlying facts had been alleged in the original complaint against Rosenthal on a breach of fiduciary duty theory.

[32]He served more than 160 pages of interrogatories, consisting of 361 numbered questions with multiple subparts, all propounded in the less-than-one month period from December 17, 1973 through January 11, 1974. Most of the interrogatories related to allegations which had remained unchanged since 1968 and 1969.

[33]Rosenthal recognizes that even with discovery his case *qua* plaintiff would not have been improved; he would still have suffered a judgment at the close of his affirmative case. "The Rosenthal parties' affirmative case was defeated by a Code of Civil Procedure section 631.8 judgment. . . . Therefore, even if the Rosenthal parties had fully discovered the factual bases of those negligence claims, their affirmative case would have met no different fate. . . . Hence, it was *qua* defendant that the Rosenthal parties were at a disadvantage because of the denial of discovery."

prevented him from obtaining the needed information, but recognizes that the validity of his position depends upon the status of the stays on January 31, 1974, when the court issued its protective orders.[34] He concedes that if either of the stay orders remained effective, "the Rosenthal parties, *qua* defendants cannot complain of judicial error in denying them discovery."

Rosenthal cannot complain. All the verbiage in the trial court and in this court notwithstanding, the stays were still in effect: Rosenthal never "sufficiently," or fully and completely, or "adequately" answered the interrogatories on which the stays were based. His own representations to the court irrefutably document the fact that such further answers as he provided before improperly undertaking his own discovery were "partial,"[35] to be answered completely at a later date, or missing entirely, held in "suspense." He repeatedly admitted as much until his requested continuance was denied on December 5, 1973. Although his position vis-à-vis the stays abruptly changed a few days later, his shift was not because he had done anything to lift the stays. It was simply because of his desire to undertake last minute discovery. His *ipse dixit* did not, however, change his answers. They remained impartial, incomplete, inadequate and insufficient, and the stays remained intact.

At no time did the trial court lift the stays. There was little doubt about the status of the stay orders. Rosenthal's own December 5, 1973, documents, filed with the court, state that the stay order previously imposed on him with reference to the 1969 interrogatories *is yet to be lifted.* On January 10, 1974, when the court was being pressed to explain why Rosenthal could not go ahead with discovery, Mr. Rhoads, Rosenthal's partner and attorney and the court engaged in the following colloquy:

"MR. RHOADS: Is it the Cabana management [1968 Interrogatories] stay order—

"THE COURT: Yes . . .

"MR. RHOADS: I really don't understand why we didn't get that discovery now.

"THE COURT: I think you have got to get all the other answers in. I don't agree . . . that the stay order in one case does not apply to all of the cases. I think the stay *orders* are applicable." (Italics added.)

---

[34]Rosenthal does not dispute the validity of the stay orders. (Cf. *Armstrong* v. *Gates* (1973) 32 Cal.App.3d 952, 958 [108 Cal.Rptr. 604].)

[35]Rosenthal's assertion that the denomination "partial" merely indicated the answers were complete but that there existed "the prospect of further answers when and if additional responsive information was uncovered" is disingenuous, to say the least. The partial answers plainly state they are *not* complete and *will be further answered.* (See fn. 26, *ante,* p. 1168.)

The colloquy continued, with specific reference to the 1968 interrogatories. Nevertheless, it is clear that Rosenthal had not relieved himself of the stays prior to his blast of discovery attempts, and he knew it. The Melchers' counsel repeatedly said it, the trial court communicated it and Rosenthal's counsel acknowledged it. The trial court was so emphatic on the point that it suggested "if a motion were before me with respect to those three depositions I would grant a protective order. . . ."[36]

A few days later, the court temporarily suspended the depositions Rosenthal wanted to take. Thereafter, the trial court issued its protective orders. When the trial court finally said "no" to Rosenthal's discovery efforts, no one had any doubt that it was because the stays were in effect. "MR. RE-GARDIE [Rosenthal's defense counsel selected by his malpractice insurers]: [P]erhaps the stay order problem could have been resolved earlier; perhaps not . . . it hasn't been resolved. . . ."[37] Rosenthal had not provided discovery and was therefore entitled to none.

As Rosenthal has conceded that if the stay orders were in effect he cannot prevail on the discovery issue, little more need be said about it. Nevertheless, Rosenthal's discovery tactics were so oppressive that they provided an independent basis for the protective orders and deserve comment here.

█ Oppression exists where there is "some showing either of an intent to create an unreasonable burden or that the ultimate effect of the burden is incommensurate with the result sought." (*West Pico Furniture Co.* v. *Superior Court* (1961) 56 Cal.2d 407, 417 [15 Cal.Rptr. 119, 364 P.2d 295].) Either will do; both are present here.

The trial court honed directly in on a major problem; the interrogatories were, basically, improper i.e., "boiler plate." The court coupled the "boiler plate" quality of the interrogatories with the fact that the lawsuits were in their 11th hour, and commented that if the case had been filed in 1973 and the question of the propriety of interrogatories was "first time up at bat, there is a strong likelihood that interrogatory might get by. . . . *In the posture of this case,* interrogatory No. 27 illustrates the impropriety of the interrogatory."

---

[36]The barrage of interrogatories launched by Rosenthal were not at issue; the Melchers did not request temporary relief pending the final outcome of their motions for protective orders.

[37]On January 16, 1974, Rosenthal filed further answers to the 1968 interrogatories and on January 31, 1974, he filed further answers to the 1969 interrogatories. This was obviously "too little, too late." Even if the answers had lifted the stays, California Rules of Court, rule 222, as it then read, barred discovery within 30 days of the trial and would have prevented the service of interrogatories on the Melchers.

The posture of the case included the fact that the "boiler plate" questions referred to a "whole series of lawsuits," many of which, the record shows, remained unchanged from the original pleadings; sought information related to documents generated by Rosenthal and still in his possession; and would have required more than 1,600 hours of preparation time in order to answer the *first* of the *nine sets* of such interrogatories.

In other words, the court perceived that the interrogatories came very late in the proceedings, were voluminous, would require so much time to answer that the trial would inevitably have to be postponed, and were without focus. In addition, the interrogatories were, in very large measure, inquiries concerning allegations which had been in the pleadings for as long as five years. The trial court should rightly have been concerned that perhaps the reason for the rush to discovery was less to obtain information than to overburden the Melchers. Furthermore, the trial court was aware that implicit in everything urged by Rosenthal with respect to discovery and the protective orders was a "renewal of [his] motion for continuance of the trial."[38] The trial court might quite reasonably have thought the motivation for the mass of Rosenthal discovery was delay, not answers.[39]

Despite its salutary purposes (see *Greyhound Corp.* v. *Superior Court* (1961) 56 Cal.2d 355, 374 [15 Cal.Rptr. 90, 364 P.2d 266]) discovery has a serious potential for abuse. (*Id.,* at p. 375.) To safeguard against this potential, Code of Civil Procedure section 2019, subdivision (b), incorporated by reference into section 2030, subdivision (b), was enacted (*ibid.*) authorizing the court to protect against "annoyance, embarrassment, or oppression." The trial court is vested with wide discretion to prevent oppression, the exercise of which will not be disturbed on appeal in the absence of abuse. (*Cembrook* v. *Superior Court* (1961) 56 Cal.2d 423, 427 [15 Cal.Rptr. 127, 364 P.2d 303].)

There was no abuse of discretion in this case. The storm of demands for discovery made by Rosenthal after five years of thumbing his nose at efforts

---

[38]Although in the trial court counsel for Rosenthal said the request for a continuance was "implicit" in all that he argued, he stated on the record, explicitly and repeatedly, that he wanted a continuance.

[39]The trial court gave as a reason for not permitting Rosenthal to conduct further depositions "[T]he entire posture of this case . . . is just not sufficient to justify the late, at the last moment discovery scurry." Rosenthal argues that the court's remarks show it erroneously shifted the burden of justifying discovery to him. He is in error. Read in the context of the various discovery proceedings, particularly those on January 22 and January 31, 1974, it is apparent that the trial court was satisfied the Melchers had demonstrated oppression and considering everything the court had before it, believed Rosenthal's rebuttal was not enough. It is perfectly proper to require rebuttal to a convincing showing of oppression. (See 2 Jefferson, Cal. Evid. Bench Book (2d ed. 1982) § 45.3.)

to get him to respond to discovery requests alerted the trial court to take a hard look at what was happening. What it saw was too many broad questions, requiring too great an expenditure of effort by the Melchers for results which Rosenthal could have obtained years earlier by complying with court orders or by looking into the records in his own possession. And, it was all coming too late in what smacked of being a continuance game on Rosenthal's behalf.

It is difficult to imagine a scenario in which a court would be more justified in saying, "Enough!" The trial court's exercise of discretion was "entirely reasonable." (*Heffron* v. *Los Angeles Transit Lines* (1959) 170 Cal.App.2d 709, 713 [339 P.2d 567, 74 A.L.R.2d 526].)[40]

(2) *The Motion for Continuance*

The sole reason given for Rosenthal's repeated requests for a continuance was his need for discovery. In view of our determination of the discovery issue, it is tempting to dismiss, out of hand, Rosenthal's contention that the trial court abused its discretion when it said "no" to his importuning, and simply to assert that the record shows no abuse. Indeed, it is tempting to add, the trial court exhibited great tolerance; *it* may well have been abused. But, Rosenthal attacks the trial court's denial of a continuance as a separate, if interconnected question. This court will not, therefore, succumb to the temptation; it will address the issue, briefly.

 The grant or denial of a continuance to permit discovery is a matter within the sound discretion of the trial court, whose ruling will not be disturbed except upon a clear showing of abuse. (*Vanderbilt Growth Fund, Inc.* v. *Superior Court* (1980) 105 Cal.App.3d 628, 638 [164 Cal.Rptr. 621]; *Wiler* v. *Firestone Tire & Rubber Co.* (1979) 95 Cal.App.3d 621, 628 [157 Cal.Rptr. 248].) There has been no abuse of discretion in this case.

Rosenthal asserts, "under the traditional view, the court's denial of a continuance was plain error." On the contrary, "the granting of continuances is not favored and the party seeking a continuance must make a proper showing of good cause." (*Foster* v. *Civil Service Com.* (1983) 142 Cal.App.3d 444, 448 [190 Cal.Rptr. 893]; see *County of San Bernardino* v. *Doria Mining & Engineering Corp.* (1977) 72 Cal.App.3d 776, 779 [140 Cal.Rptr. 383]; Cal. Rules of Court, rule 224; § 9, subd. (b), Standards

---

[40]*Greyhound Corp.* v. *Superior Court, supra,* 56 Cal.2d at page 380 cites *Heffron* with approval: "[I]n . . . *Heffron* . . . it was properly pointed out that it is not an abuse of discretion to deny discovery when the party seeking the information had been so dilatory that allowance of discovery would hinder rather than expedite the trial."

Jud. Admin.) In the trial court, Rosenthal failed, miserably, to show good cause for a continuance. He has done no better on appeal.

When Rosenthal first moved for a continuance, in December 1973, some of the consolidated cases were more than five years old and all the cases were overdue for trial. The trial date had been selected months before by Rosenthal and the other parties. Three months prior to his motion for continuance the trial court had been assured by Rosenthal's attorney that his case preparation had long since been geared to the March 4, 1974, trial date: "We have calendared the law firm business as well as calendared our discovery procedures . . . to coincide with the March date. That was done many months ago. . . ." Presumably, then, he was ready for a March trial. Not so, Rosenthal contends: the case was not ready for trial because of the "new negligence causes of action." The "new" pleadings, he argues, gave him good cause for a continuance. His position, he claims, is "approved" by section 9, subdivision (b)(5) of the Standards of Judicial Administration, which provides: "The following matters should, under normal circumstances, be considered good cause for granting the continuance of a trial date: (5). A significant change in the status of the case where, because of a change in the parties or the pleadings ordered by the court, the case is not ready for trial."

Section 9 is of no help to Rosenthal. His first (and subsequent) motion was not made in "normal circumstances." It was presented under the (hopefully) abnormal circumstances of a case in which the moving party has been dilatory in the extreme *and* has *stipulated* to a trial date which it seeks to discard over objection.

Nor was Rosenthal's motion compelling because there had been a "significant" change in the case. The trial court expressly rejected the notion that a significant change had been brought about by the added negligence claims. In fact, it perceived *no* change at all: "That amended pleading didn't change the posture of the case one iota. . . . The substance was not changed."

Neither did the trial court believe the recently expanded involvement in the case of one of Rosenthal's attorneys[41] amounted to the changes contemplated by the Standard: "[T]hey . . . sat back and for five years, roughly, they thought they had no problems and couldn't care less . . . [I]t would be

---

[41]Rosenthal, *qua* plaintiff, was at all times represented by his law firm, including himself. Rosenthal, *qua* defendant, was represented by attorneys selected by his malpractice insurers. The insurers were ambivalent about being in the case. They, nevertheless, provided counsel, Mr. Regardie, of Kirtland & Packard, who had defended Rosenthal for years in some of the cases, and assumed his defense in all the cases about two months before trial.

. . . a little different if your firm had never been involved, but obviously they had been here. . . . [T]hey were sitting back and letting Mr. Rosenthal and Mr. Rhoads and the predecessor firms handle this litigation. That is the choice they made and they have got to live with it."

Furthermore, it appears as if a section 9, subdivision (b)(5) "significant" change is one which occurs as a result of a court order, rather than because of a change to which the parties have agreed.

This may be gleaned from the language of the introduction. "In general, the necessity for a continuance should have resulted from an *emergency* . . . that could not have been *anticipated or avoided*." (Italics added.) The amended pleadings in the instant case hardly fit the "emergency" contemplated by the standard. The "new" allegations of negligence were not ordered by the court; they were permitted by stipulation, and they would seem to be the *anticipated* consequences of that agreement.

In sum, the trial court saw no good cause for a continuance, and neither do we.

b. *Denial of a Jury Trial*

Rosenthal recognizes that he waived his right to trial by jury. His contention is that it was an abuse of discretion for the trial court to refuse him relief from his waiver.

At no time prior to January 23, 1974 (about five weeks before trial), did Rosenthal, *qua* plaintiff or defendant, ever suggest that he wanted a jury trial. In none of the cases had he filed demand for a jury. On August 30, 1973, he clearly indicated that he did not intend to file such a demand.[42] On October 11, 1973, he filed two written waivers of trial by jury, encompassing each of the consolidated cases.[43] It was only on January 23, 1974, and only *qua* defendant, that he filed a "demand for jury." He recognizes

---

[42] The statement was made by Mr. Rhoads, Rosenthal's partner and attorney. Rosenthal's representation, prior to trial, is somewhat confusing. In most of the cases his firm was counsel of record for him, for his various law firms and alter egos; in some of the cases it represented Green as well. As of August 30, 1973, Rosenthal, his law firm and Green were being defended by Mr. Regardie of Kirtland & Packard (selected by Rosenthal's malpractice insurers) in case Nos. 947515 and 948124. Green was represented by Leonard Nasatir of Caditz & Grant in case Nos. 938682 and 952950. Mr. Nasatir was not there to carry a laboring oar. According to his statements to the court, his role was to defend Mr. Green and assure that his liability, if any, was vicarious.

[43] Rosenthal argues that the waivers were ineffective in those cases in which Mr. Regardie was not yet of record, even though he waived as to *all* the consolidated cases. His contention cannot prevail. He waived in all cases, through Mr. Rhoads. Further, the cases had been consolidated for all purposes, presumably including jury waivers.

what is well settled law: the purported demand was nothing more than a request that the court exercise its discretion to relieve him of his waiver.[44] "It has been a general rule in California that once a party has waived right to jury trial that waiver cannot thereafter be withdrawn except in the discretion of the trial court." (*Taylor* v. *Union Pac. R.R. Corp.* (1976) 16 Cal.3d 893, 898 [130 Cal.Rptr. 23, 549 P.2d 855].)

Rosenthal can prevail on this issue only if the trial court abused its discretion. "Because the matter is one addressed to the discretion of the trial court, that court's denial of a request for relief of jury waiver cannot be reversed in the absence of proof of abuse of discretion. [Citations.] As with all actions by a trial court within the exercise of its discretion, as long as there exists 'a reasonable or even fairly debatable justification, under the law, for the action taken, such action will not be here set aside, even if, as a question of first impression, we might feel inclined to take a different view from that of the court below as to the propriety of its action.' (*Harrison* v. *Sutter St. Ry. Co.* (1897) 116 Cal. 156, 161 [47 P. 1019].)" (*Gonzales* v. *Nork* (1978) 20 Cal.3d 500, 507 [143 Cal.Rptr. 240, 573 P.2d 458].)

In exercising its discretion, a trial court may consider diverse factors: "[D]elay in rescheduling the trial for jury, lack of funds, timeliness of the request and prejudice to all the litigants." (*McIntosh* v. *Bowman* (1984) 151 Cal.App.3d 357, 363 [198 Cal.Rptr. 533]; see, *March* v. *Pettis* (1977) 66 Cal.App.3d 473, 480 [136 Cal.Rptr. 3].) The court may also consider, "prejudice to . . . the court, or its calendar" (*Bishop* v. *Anderson* (1980) 101 Cal.App.3d 821, 824 [161 Cal.Rptr. 884]), the reason for the demand, i.e., whether it is merely a "pretext to obtain continuances and thus trifle with justice" (*Cowlin* v. *Pringle* (1941) 46 Cal.App.2d 472, 476 [116 P.2d 109]), whether the parties seeking the jury trial will be prejudiced by the court's denial of relief (*Gonzales* v. *Nork, supra,* 20 Cal.3d at p. 511) and whether the other parties to the action desire a jury trial. (*March* v. *Pettis, supra,* 66 Cal.App.3d at p. 480.)

 Here, the trial court exercised its reasoned discretion in making its decision. (*Gonzales* v. *Nork, supra,* 20 Cal.3d at p. 511.) It was painfully aware of the havoc a jury trial would create in the court system. "Counsel's time estimates for a *nonjury* trial were 'Four to five months. . . . Six or eight months.'" Rosenthal's counsel informed the trial judge that without a jury it would take from eight to twelve months. The presiding judge of the court had said, "I predict that this will be the longest civil trial in the history of this County." The trial court recognized that a jury trial would substan-

---

[44]This is not a case of inadvertent waiver such as *Boal* v. *Price Waterhouse & Co.* (1985) 165 Cal.App.3d 806 [212 Cal.Rptr. 42].

tially prolong what was going to be an extremely lengthy trial: "You have been talking about trial estimate that would be—well I shudder to think of it. . . . It is that bad."

From the first status conference, the trial judge observed that a jury trial would entail "all sorts of additional complex planning. . . ." The trial court envisioned a "bifurcation or unconsolidation" if the case had to be tried to a jury.

It is apparent that granting Rosenthal's belated request for a jury trial would substantially have lengthened the trial, making the trial judge unavailable for other assignments beyond the already time contemplated. It would probably have required vacating the stipulated trial date selected months earlier, and might have necessitated two or more separate trials instead of the consolidated trial. Obviously, granting Rosenthal relief from his waiver of jury trial would have caused prejudice to the court and its calendar.

The Melchers never requested a jury trial; they were opposed to one. Aside from the fact that their counsel believed the case to be an inappropriate one for a jury, the Melchers had a compelling economic reason for their opposition. The action was costing them approximately $20,000 per month. Any delay or increase in the length of trial would have increased their already staggering legal expenses. Prejudice to the Melchers was a factor which, standing alone, justified the trial court's denial of Rosenthal's request. (*Bishop* v. *Anderson, supra,* 101 Cal.App.3d at p. 824.)

Rosenthal gave no reason for his lately found desire for a jury trial. It is well settled that a simple change of mind is not enough to justify relief from a jury waiver. (*Gonzales* v. *Nork, supra,* 20 Cal.3d at p. 508; *March* v. *Pettis, supra,* 66 Cal.App.3d at p. 480; *Cloud* v. *Market Street Ry. Co.* (1946) 74 Cal.App.2d 92, 104 [168 P.2d 191].) Rosenthal's request appears to have been a tactical about-face. It was not an abuse of discretion for the trial court to deny relief on that basis, alone.

The timing of Rosenthal's request for relief from his jury waiver suggests that it was a ploy to obtain a continuance. His repeated requests for continuances had been denied; the March 4 trial date appeared firm. But the trial court had stated that trial would probably have to be postponed if the case was tried to a jury. What better way to compel a continuance than to demand a jury trial? The implication is plain, and the trial judge most likely perceived it: Rosenthal's request for relief from his waiver was a back door path to a continuance. The trial court was justified in denying Rosenthal relief on the basis that his request was being used as a "pretext to obtain

continuances and thus trifle with justice." (*Cowlin* v. *Pringle, supra,* 46 Cal.App.2d at p. 476.)

There existed in this case "reasonable or even fairly debatable justification, under the law, for the action taken." (*Harrison* v. *Sutter St. Ry. Co., supra,* 116 Cal. at p. 161.) The trial court exercised its discretion in the context of what it perceived to be these justifications. It did not act arbitrarily; rather, it proceeded reasonably in making its decision. (*Gonzales* v. *Nork, supra,* 20 Cal.3d at p. 511; *McIntosh* v. *Bowman, supra,* 151 Cal.App.3d at p. 363.)

Finally, there has been no showing of prejudice by Rosenthal. He merely asserts that what he missed is "the common sense of a jury . . . the balance of collective reflection." Every nonjury trial lacks this "common sense" and "collective reflection." The distinctive ingredient in a court trial is the absence of group deliberation. This distinction, alone, cannot amount to prejudice. (*McIntosh* v. *Bowman, supra,* 151 Cal.App.3d at p. 363; *Byram* v. *Superior Court* (1977) 74 Cal.App.3d 648, 653 [141 Cal.Rptr. 604].)

"Prejudice by a nonjury trial cannot be presumed; on the contrary, it is presumed that the party had the benefit of a fair and impartial trial as contemplated by the Constitution." (*McIntosh* v. *Bowman, supra,* 151 Cal.App.3d at p. 363; *Glogau* v. *Hagan* (1951) 107 Cal.App.2d 313, 318-319 [237 P.2d 329].) Lack of prejudice is yet another reason why Rosenthal cannot prevail on the jury trial question.

In face of the trial court's reasonable exercise of its discretion, Rosenthal makes two arguments which need to be addressed, briefly. First, he suggests that the trial court had a predisposition against a jury trial which caused it to exercise its discretion in an arbitrary manner. This is nonsense. The court recognized that dealing with the 13 consolidated cases as jury matters would be complex. Separating the legal jury issues from the equitable court issues would present difficult problems. Finding jurors willing to serve for the requisite length of time would not be easy. Should anything happen during trial which depleted the number of jurors and alternates below 12, the specter of a mistrial would arise.

It was in this context that the trial court stated what was patent: "In view of the incredible burden that this litigation imposes upon the taxpayers of this community . . . . I think it would be an incredible abuse of the court's discretion to restore[45] the case to a jury calendar. . . ." When the court expressed its view, the extended deadline for a jury demand had long passed

---

[45]"Restore" is inaccurate. The case had *never* been on the jury trial calendar.

and Rosenthal had already filed his two waivers. The trial court had given Rosenthal every opportunity to exercise his constitutional right to a jury trial and had even bent the statutory rules in Rosenthal's favor. His argument that the trial court's rational view amounted to a negative predisposition and caused an arbitrary ruling, is specious.

Rosenthal also presents a novel claim that he was entitled to ride on the coattails of codefendant Green, who also filed a jury demand on January 23, 1974. As had Rosenthal, Green had expressly waived jury trial, in writing, twice, in waivers filed on his behalf by two sets of his attorneys. The waivers had been filed in all the consolidated cases. Nevertheless, the trial court afforded Mr. Nasatir the opportunity to waive or demand by October 31, 1973. By that date Mr. Nasatir had filed neither a waiver nor a demand, nor had he asked for an extension of the deadline. From time to time thereafter, the trial court made statements which implied that Green through Mr. Nasatir still had a right to demand a jury trial. However, the trial court never extended the deadline beyond October 31, 1973.

Rosenthal is of the view that Green was entitled to a jury trial, as a matter of right, because of his January 23, 1974, demand. In this, Rosenthal is in error. Green was in no different position on that date than was Rosenthal. He had expressly waived a jury trial and had allowed the Code of Civil Procedure section 631, subd. 4, time, as extended by the trial judge, to lapse without asserting his right. His "demand" was nothing more than a request addressed to the court's discretion.

Furthermore, it was Green's demand, not Rosenthal's. Green is not here before this court, complaining. Rosenthal has no standing to assert error with respect to Green (*Broadway Fed. etc. Loan Assoc.* v. *Howard* (1955) 133 Cal.App.2d 382, 400 [285 P.2d 61]; *Fisher* v. *Nash Bldg. Co.* (1952) 113 Cal.App.2d 397, 404 [248 P.2d 466]).

Rosenthal voluntarily gave up his right to a jury trial. There is nothing in the record which supports his contention that the trial court was required to return it.

We have examined each of Rosenthal's remaining contentions and find no error.[46]

The judgments are affirmed.

---

[46]Rosenthal's counsel on appeal has raised and vigorously and skillfully presented every conceivable issue which could be urged on behalf of his client. Notwithstanding counsel's efforts, the decision below is sustained by the record.

Lui, Acting P. J., concurred.

**ARABIAN, J.**—I concur in the judgment and in the well reasoned analysis of the opinion. I write separately to additionally address that aspect of the case which deals with the conduct of counsel.[1]

Honorable men and women are plentiful in the profession of the law who fully fathom that membership within its ranks entails privileges, conditions and burdens.

Yet, the recorded history of this matter discloses a course of conduct pursued by a votary of greed, who was insatiate in his avaricious appetite, lamentable in his judgment, and who engaged in a constant and deliberate usurpation of his noble office.

"In a profession, where unbounded trust is necessarily reposed, there is nothing surprising that fools should neglect it in their idleness, and tricksters abuse it in their knavery, but it is the more to the honour of those, and I will vouch for many, who unite integrity with skill and attention, and walk honourably upright where there are so many pitfalls and stumbling blocks for those of a different character."[2]

Guiding this protracted litany of litigation through many years, counsel has arraigned his profession, subjecting it to an abuse of the most pernicious kind.

He protests that his name and reputation have been besmirched by the judgment below and urges that we allow him to rise phoenix-like[3] from the embers of his proven path of craft, trick and falsehood.

"In law, what plea so tainted and corrupt but, being seasoned with a gracious voice, obscures the show of evil?"[4] Here none so obscures.

The answer to his plea and protest is as follows: "Craft is the vice, not the spirit of the profession. Trick is professional prostitution. Falsehood is professional apostasy. The strength of a lawyer is in thorough knowledge of legal truth, in thorough devotion to legal right. Truth and integrity can

---

[1]All references herein deal exclusively with attorney at law Jerome B. Rosenthal.

[2]Sir Walter Scott, The Antiquary, chapter 43.

[3]A legendary bird represented by the ancient Egyptians as living five or six centuries in the Arabian desert, being consumed in fire by it own act, and rising in youthful freshness from its own ashes. (Webster's Third New Internat. Dict., p. 1699.)

[4]Shakespeare, Merchant of Venice, act 3, scene 2.

do more in the profession than the subtlest and wiliest devices. The power of integrity is the rule; the power of fraud is the exception."[5]

A petition for a rehearing was denied September 6, 1985, and appellants' petition for review by the Supreme Court was denied October 16, 1985.

---

[5]Judge Edward G. Ryan, Address, University of Wisconsin Law School, 1880.